JEFF A.C., JR., Appellant,

v.

STATE of Alaska, Appellee.

No. S–11366.

Supreme Court of Alaska.

July 15, 2005.

Shelley K. Chaffin, Law Office of Shelley K. Chaffin, Anchorage, for Appellant.

Mary Ann Lundquist, Assistant Attorney General, Fairbanks, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A father appeals the termination of his parental rights for his young daughter. Incarcerated shortly after impregnating the mother, the father did not know of the child's existence until about one year later. By that point, the child had been judged a child in need of aid and the state had taken numerous steps to terminate the parental rights of the mother and her boyfriend, the putative father, and to permanently place the daughter for adoption with her foster parents. A termination hearing was held regarding both parents about one year after the father learned of the existence of the child. The mother voluntarily relinquished her rights, and the court terminated the father's rights on the grounds of abandonment and neglect. The father contends that his procedural due process rights were violated, and that the superior court erred in its findings that he had abandoned and/or neglected his daughter, that the state had made reasonable efforts to reunify, and that the termination was in the best interests of the daughter. Concluding that the father's due process rights were observed by the superior court and that the court's findings are supported by the record, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

After his March 2000 release from prison, Jeff C. resumed a relationship with Melanie G.[1] Their relationship was strained by physical and verbal aggression and heavy drug use. Jeff engaged in drug distribution and may have been Melanie's supplier of crack cocaine. In early June 2000 Melanie suffered nausea and her period was late. She testified that she told Jeff that she thought she was pregnant; Jeff denied this. Shortly thereafter, she reported a domestic assault incident to the police. When the police stopped Jeff in his vehicle, they also discovered scales with drug residue on them. He was accordingly arrested for violating probation and re-incarcerated from June 15, 2000

---

1. Pseudonyms have been used to protect the    identity of family members.

to August 15, 2001. After the arrest, Jeff had no further contact with Melanie.

Melanie continued using cocaine and marijuana during the pregnancy. On February 14, 2001, Jasmine G. was born cocaine-positive. In light of her critical medical condition, the state successfully sought an emergency petition for child-in-need-of-aid (CINA) adjudication and temporary placement. Jeff, in prison, was unaware of Jasmine's birth or emergency CINA adjudication. After two weeks in intensive care, Jasmine went home with a foster family, with whom she has resided her entire life.

At the birth, Melanie named her then-current boyfriend, Jimmy D., as the father. Jimmy agreed that he was the father. However, Melanie mentioned Jeff as another sexual partner. In the words of a social worker present, Melanie "was not the greatest historian regarding the period of time from when she became pregnant." The state listed Jimmy as the "putative father" and requested that the court order him to be tested for paternity of Jasmine.[2] Because of Jimmy's frequent jail transfers and lack of a stable residence, the paternity testing proved difficult to obtain.

In May 2001 Melanie told her social worker that Jeff could be the father, adding that the baby looked like Jeff and that Jeff was incarcerated in the Palmer Correctional Center. Accordingly, while continuing to seek Jimmy's DNA, the social worker also requested Jeff's DNA sample. The prison replied that they had no prisoner named Jeff C. The state was unable to further pursue Jeff at this point because it had no identifying information and because there were several persons named Jeff C. in Alaska. In addition, Melanie was regularly out of contact with the department, and when she was in contact, she was often unhelpful.

In July 2001 the superior court accepted a stipulation by Melanie and Jimmy, listed as the father, and adjudicated Jasmine as a child in need of aid. The CINA grounds were AS 47.10.011(8) (mental injury) and (10) (intoxicant use), resulting from Melanie's prenatal drug use and both parents' history of assaultive behavior. The parents consented to treatment plans.

In August 2001 Jeff was released from prison. Concluding that Anchorage had become a bad environment for him, Jeff moved home to Pittsburgh, Pennsylvania to live with his father and grandmother. Before his departure, Jeff met with his social worker to discuss outstanding issues related to his two daughters from a prior relationship who had been adjudicated as children in need of aid.[3] He was unaware of Jasmine or the proceeding involving her. Since his return to Pennsylvania, Jeff claims that he has avoided drugs, assaultive conduct, and other unlawful behavior.

On November 20 the state received the results of Jimmy's paternity testing, which excluded Jimmy as Jasmine's biological father. Shortly thereafter, a social worker in Jasmine's case happened to notice the existence of a Jeff C. who was involved in another CINA case.[4] The state arranged for a paternity test of Jeff to be conducted using a DNA sample already collected in the other case.

In December 2001 the superior court held a disposition hearing on Jasmine. The resulting order concluded that efforts to return the child to Melanie or Jimmy—who telephonically appeared in court as the putative father—were unsuccessful, that Melanie had not complied with her case plan and Jimmy was incarcerated, and that the state should continue with custody. The court set a permanency hearing for February 13, 2002.

By January 2, 2002 the state received the results of Jeff's paternity test, which established him as the biological father. Jeff learned of this result on January 30 during a

---

2. The state suggests that it is standard procedure to exclude the first-named father before testing others.

3. These daughters were CINA-adjudicated in 1997 due to reoccurring violence between their parents. With respect to these daughters, Jeff has maintained his residual parental rights and apparently keeps in regular contact with them and their therapists.

4. Jeff has two daughters by another woman; each girl has been adjudicated as child-in-need-of-aid.

telephone conversation with the social worker from his other case. On February 5 Jeff received in the mail a summons for Jasmine's permanency hearing, with a copy of the earlier disposition order attached. Jeff failed to respond to the summons. After the permanency hearing—in which only the mother participated—the court concluded that Jasmine remained in need of aid and that out-of-home permanent placement was in the child's best interests. Accordingly, the court instructed the state to "proceed to finalize permanency for the child by filing a petition to terminate parental rights by March 13, 2002." The state filed this petition on March 12. Jeff received a copy in the mail on April 1.

Jeff contacted Jasmine's social worker in early April. After numerous messages back and forth, the two finally communicated on April 23—by which point Jasmine was fourteen months old. The social worker told Jeff of the birth and of Jasmine's developmental problems and medical needs resulting from the prenatal substance exposure. Jeff expressed anger that they had obtained and tested his DNA sample without his knowledge or permission. He also asked for additional information, including medical reports. When asked what he planned to do, Jeff responded that he did not know and that he would call back that Friday. He did not call back on Friday. The social worker then contacted Melanie, who gave a highly unfavorable impression of Jeff's personality and past behavior.[5] In later conversations, Jeff did not express a firm intent or desire to parent Jasmine.

On May 2, the social worker informed Jeff that the case plan for his other daughters would be adopted in this case. Jasmine's case plan also required Jeff to "educate himself on his child's special needs and requirement for specialized care—consulting with the social worker and his child's therapists." The case plan had concurrent goals of (1) returning the child to her father, and (2) placing the child up for adoption.

Jeff was given the opportunity on May 9 to speak with the foster mother and to participate in a conference on the status of the child. Jeff declined to participate. The social worker later asked the foster mother to call Jeff. In July the foster mother reached him and described Jasmine's birth and medical problems. Jeff did not express any intentions or plans regarding Jasmine.

Jeff's conversations with his social worker during the summer of 2002 became increasingly strained. He expressed anger when he came to understand that the state was concurrently working toward adoptive placement. At one point he "exploded" and stated that he thought the state was not being fair with him. He complained that it was hard to reach the social worker and that he had not yet received in the mail any photographs or medical information. Jeff's personal counselor, who sometimes joined in the conversations, later testified that the relationship between Jeff and the Alaska social workers was adversarial.

Jeff did not request visitation with Jasmine until September 4, 2002. As a trip to Anchorage was planned to visit his other daughters, Jeff asked if he could also schedule visits with Jasmine. This trip was ultimately cancelled. On November 26 Jeff failed to participate in a second administrative review of Jasmine's case.

Beginning in November, Jeff and the foster mother had contact once a month. Jeff did not state any desire to visit, let alone parent, Jasmine. Though Jeff testified that "he had made up his mind to parent Jasmine as of May 2002," he also testified that he feared that Jasmine suffered from facial deformities and "consider[ed] relinquishing his parental rights 'if she was in dire straits.'" In fact, in October he discussed relinquishing his parental rights with his counselor due to the high level of care the child required. He now argues that he could not make a final decision about parenting before seeing certain additional information, including photographs and medical records.[6]

**5.** Melanie later completed an affidavit stating that she does not want Jasmine to be placed with Jeff or any of his relatives.

**6.** The social worker mailed this information in September, but Jeff claims he never received this package. Jeff received a second package in December. Because he was working in Indianapo-

Jeff traveled to Anchorage in January 2003 to participate in the mediation of both of his CINA cases. The mediation regarding Jasmine was unsuccessful. During his stay, Jeff was permitted open-ended visitation with Jasmine. He made five visits of one to two hours, supervised by the foster mother. While it appears that the visits were pleasant, the foster mother later testified that Jeff spent considerable time talking on his cell phone, was in a hurry to leave, and continued to avoid stating any intention regarding Jasmine. Jeff offered to purchase toys and clothes for the daughter, but the foster mother declined. Jeff later testified that he was surprised to find a healthy and beautiful child, not as sickly as described. While in Anchorage, Jeff apparently revived his relationship with the mother of his other children, a relationship in the past marked by extensive violence. Jeff returned to Pennsylvania on February 1 and had no further contact with the social worker. Jeff later testified that he did not intend to move to Anchorage, even temporarily, to establish a gradual bond with Jasmine, unless he received an "iron-clad" guarantee from the state that he would get custody.

Jasmine continues to have developmental problems. At seventeen months, she stopped talking and regressed in motor skills. She requires ongoing medical monitoring and has formed strong emotional attachments to her foster mother and father. The state put on expert testimony at trial that trauma would result to Jasmine if removed from her foster family's care.

### B. Proceedings

As noted, the state filed a petition to terminate the parental rights of Melanie and Jeff in March 2002. A bench trial before Superior Court Judge Morgan Christen began in March 2003. After the state presented its case, Melanie voluntarily relinquished her parental rights. After the close of trial,

the superior court terminated Jeff's parental rights. It found that Jeff abandoned Jasmine under AS 47.10.013(a)(2)-(3), that he neglected her under AS 47.10.014, that he has not remedied these conditions, that the state made reasonable efforts "to provide appropriate family services, based on the facts and circumstances of the case" and to achieve permanency for the child, and that termination was in the best interests of the child. Jeff appeals.

### III. STANDARD OF REVIEW

■■■■ Whether Jeff's due process rights were violated is a question of law,[7] as is the question whether the superior court's findings meet the requirements of the applicable child-in-need-of-aid statutes and rules.[8] We review questions of law *de novo*, and will adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

■■■■ We review the factual findings underlying the superior court's termination decision for clear error, and will reverse only if the record leaves us with a definite and firm conviction that the superior court has made a mistake.[10]

### IV. DISCUSSION

#### A. Jeff's Procedural Due Process Rights Were Not Violated.

Jeff's first contention on appeal is that the state violated his rights to procedural due process by denying him any opportunity to participate in an adjudication hearing. He complains that he was not given notice of the initial 2001 CINA adjudication in violation of CINA Rule 7(b), which requires that notice be given to "the parents." In addition, because an adjudication is generally required before the state can seek termination of parental rights, Jeff argues that he was entitled to participate in an adjudication before being subjected to a termination hearing. Jeff re-

lis at the time, and subsequently traveled to Alaska, he did not actually view the packet until February 2003.

**7.** *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 207 (Alaska 2000) (citations omitted).

**8.** *Id.*

**9.** *Id.* (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**10.** *Id.* at 207–08.

quested bifurcation of adjudication and termination, but the superior court denied his request without comment. We consider first whether due process or the CINA statutes and rules entitled Jeff to first participate in an adjudication hearing.

▮▮▮▮ Due process under the Alaska Constitution "requires, at a minimum, that parties be notified of the subject of proceedings concerning them so that they will have a reasonable opportunity to be heard." [11] Similarly, CINA Rule 15(b) requires the state to give notice prior to an adjudication hearing "to the persons specified in CINA Rule 7(b) within a reasonable time prior to the hearing." CINA Rule 7(b) requires the notice to be given to "the parents ... if these parties can be found after diligent efforts."

The state filed an emergency petition for CINA adjudication on February 20, 2001, and the parties stipulated to probable cause for adjudication two days later. The parties stipulated to a permanent adjudication that Jasmine was a child in need of aid in July 2001. That stipulation was entered into by Melanie and Jimmy, her then-boyfriend. At the time of the emergency and permanent adjudications, the state reasonably believed that Jimmy was the father,[12] while Jeff's identity and location remained unknown. Because Jeff could not be "found after diligent efforts," the state had no obligation to send him notice; accordingly, it complied with the CINA notice requirements during the initial adjudications.

▮▮▮▮ Jeff also argues that he has an absolute entitlement to participate in an adjudication before being subjected to a termination hearing. Generally, an adjudication must take place before a termination, even if within the same hearing,[13] to give the state custody of the child and the court jurisdiction to terminate.[14] There is no support in the CINA statutes, rules, or case law, however, for Jeff's proposition that all parents are entitled to participate in this procedure. While known parents must be given adequate notice, the ultimate focus of a CINA adjudication is on the *child*, not the parents. Thus, a child can be adjudicated based on the acts of just one parent, for we have stated that "the other parent's acquiescence or fault in allowing the abuse to occur is not required in order to find the child to be in need of aid." [15] Adjudication is the mechanism to determine a child's status and to enter the child into state custody.[16] The parent's action (or inaction) is rather the focus of the later termination hearing.[17]

▮▮▮▮ The language of the termination statute also indicates that a specific parent's acts need not have been the subject of a prior adjudication hearing. A termination requires the state to show by clear and convincing evidence that "the child has been subjected to conduct or conditions described in [the adjudication statute]" [18] and that the parent has not remedied these conditions.[19] Thus, it is *not* required that such conduct or conditions be the same as those which formed the basis for the previous CINA adjudication.[20] This case serves as an illustra-

11. *Potter v. Potter*, 55 P.3d 726, 728 (Alaska 2002).

12. Jimmy was named father and agreed with this designation at birth, participated with an attorney in subsequent court hearings, and had not yet been excluded as the father by the results of his DNA paternity test.

13. *See* CINA Rule 18(b); *D.M.*, 995 P.2d at 208.

14. AS 47.10.088(d).

15. *A.H. v. State*, 779 P.2d 1229, 1232 (Alaska 1989).

16. Once a child is CINA-adjudicated, the state follows general time lines during which it will attempt to reunite the family or, if that process fails, move to terminate the parents' rights. *See*

AS 47.10.080. The termination hearing in this case followed these time lines; for example, the state filed the termination petition against both parents within the deadline set by the court's final permanency hearing.

17. *See, e.g.*, AS 47.10.088(a)(1)(B) (providing for termination if "the parent ... has not remedied the conduct or conditions in the home that place the child at substantial risk of harm....").

18. AS 47.10.088(a)(1)(A).

19. CINA Rule 18(c); AS 47.10.088(a).

20. The 1999 amendments to the CINA rules make this point clear. The pre-amendment termination rule required clear and convincing evidence that "the parental conduct that caused the

tion. While the adjudication was based on drug exposure and risk of mental injury (caused by the mother), the termination of Jeff's rights was based on his abandonment and neglect. Thus, to terminate his rights, the state needed to prove conduct amounting to abandonment or neglect and that Jeff failed to remedy those conditions. It did not need to prove anything about what initially compelled the state to seek custody to protect the child. We therefore conclude that Jeff did not have an absolute right to participate in an adjudication hearing.[21]

## B. The Superior Court Did Not Err in Finding Abandonment and Neglect.

Jeff next argues that the superior court's conclusions leading to termination were not supported by the record and were therefore erroneous. To terminate parental rights, the state must first show by clear and convincing evidence that (1) "the child has been subjected to conduct or conditions described in AS 47.10.011" and (2) the parent has failed to remedy such conduct or conditions.[22] Based upon its lengthy factual findings, the superior court concluded that Jeff subjected the child to abandonment and neglect and that he failed to remedy either condition. Jeff argues that the factual findings were insufficient as a matter of law to support a conclusion of abandonment or neglect.

Abandonment is defined generally as occurring when "a parent ... has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[23] We have interpreted the general abandonment test to encompass two prongs: "(1) whether the parent's conduct evidenced a disregard for his or her parental obligations, and (2) whether that disregard led to a destruction of the parent-child relationship."[24] We apply an objective test to see if actions demonstrate a willful disregard of parental responsibility; we do not look to the parent's subjective intent or "wishful thoughts and hopes for the child."[25] The CINA statutes also define specific examples of abandonment, two of which the superior court concluded were committed by Jeff: (1) that he "has made only minimal efforts to support and communicate with the child" and (2) that he "failed for a period of at least six months to maintain regular visitation with the child."[26]

The trial court's finding of abandonment under this test is adequately supported by the record. We have said that "a parent has an 'affirmative duty ... [to show] continuing interest in the child and [to make] a genuine effort to maintain communication and association'; token efforts to communicate with a child will not satisfy this duty."[27] The rec-

minor to be adjudicated a child in need of aid is likely to continue unless parental rights are terminated." Former CINA Rule 18(c), *as later amended by* SCO 1355, effective July 15, 1999. This language seems to require the termination to be grounded on the same harmful conditions that brought about the initial adjudication. The current language, on the other hand, allows a termination to be based upon any harmful CINA condition, not just the one that formed the basis for the adjudication.

21. We also note that because Jeff enjoyed a full trial in which to contest the state's allegations of abandonment and neglect, he has failed to show prejudice in being denied a prior adjudication. We have said that "nothing resolved at the adjudication stage foreclose[s] a parent from fully litigating all relevant issues at the termination stage." *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 209 (Alaska 2000). Moreover, the court found that Jeff's abandonment and neglect were ongoing and unremedied, and

these findings were made under a higher quantum of proof than what would have been required in an adjudication hearing. *Compare* AS 47.10.088 ("clear and convincing evidence" for termination) *with* AS 47.10.011 ("preponderance of the evidence" for adjudication).

22. AS 47.10.088(a).

23. AS 47.10.013(a).

24. *G.C. v. State, Dep't of Health & Soc. Servs.*, 67 P.3d 648, 651 (Alaska 2003) (quotation omitted).

25. *Id.* at 652 (citations and quotations omitted).

26. AS 47.10.013(a)(2)-(3).

27. *In the Matter of H.C.*, 956 P.2d 477, 481 (Alaska 1998) (quoting *E.J.S. v. State*, 754 P.2d 749, 751 (Alaska 1988)).

ord shows that Jeff failed to meet his "affirmative duty" to show a genuine interest in the child and that his minimal efforts to communicate were merely "token efforts." A review of Jeff's pattern of behavior demonstrates that he failed to objectively manifest a desire to be involved in Jasmine's life.

As an initial matter, Jeff argues that his absence during the first year of Jasmine's life should not count against him because a "person cannot abandon a person or relationship the person does not know exists." While we agree generally with this proposition, we note that Melanie testified at trial and in an affidavit that she informed Jeff about a possible pregnancy shortly after conception. During and after incarceration, Jeff made no effort to determine whether he had in fact fathered a child.

Jeff insists, however, that he did not know of Jasmine's existence until January 2002. Even accepting his claim, the superior court's finding of abandonment is still justified by the evidence in the record regarding Jeff's actions between January 2002 and the start of trial in March 2003. In February 2002 Jeff received advance written notice of a permanency hearing regarding Jasmine—during which the court ordered the filing of a petition to terminate his parental rights—and failed to participate in the hearing or contact any state office in response. During his first telephone conversation with the social worker in April, Jeff gave no intention regarding Jasmine, but stated that he would call back on the following Friday to announce his intentions. He did not call back and never subsequently expressed his intent to parent Jasmine. In early May he declined the opportunity to speak with the foster mother and participate in a conference regarding Jasmine. In November he failed to participate in another conference on Jasmine. He did not request any visitation with Jasmine until September—roughly eight months after learning of her existence. In addition, while complying generally with his case plan, he failed to complete any of the requirements specific to Jasmine, such as learning about

her medical needs or spending time with her to form a bond. Even when he came to Anchorage in January 2003, Jeff's visits with Jasmine were erratic and short; he spoke frequently on his cell phone and appeared to be in a hurry to leave.

■ Most importantly, from when he learned of Jasmine until trial—a period of over one year—there was no evidence that Jeff manifested any desire to the social worker or the foster mother to parent Jasmine. We reject his position that he needed photographs and additional medical information before deciding whether to parent Jasmine. To disregard a parental obligation while trying to decide whether to undertake that obligation is still a disregard of a parental obligation. In light of these facts, we conclude that the superior court did not err in finding abandonment.[28]

## C. The Superior Court Did Not Err in Finding that the State Made Reasonable Efforts To Reunite.

Jeff's next contention is that the record does not bear out the superior court's conclusion that the state made "reasonable efforts" (1) "to provide appropriate family support services, based upon the facts and circumstances of the case, but those efforts were unsuccessful"; and (2) "to achieve permanency for the child." Jeff argues that the state did not make reasonable efforts to locate him, the natural father, after Jasmine's birth. He also argues that once notified of Jasmine's existence, rather than putting forth reasonable efforts to reunify, the state's actions demonstrated "its intent to thwart" Jeff's right to parent his daughter.

■ The termination statute requires the state to prove by a preponderance of the evidence that it has "complied with the provisions of AS 47.10.086 concerning reasonable efforts." [29] Those provisions require the state to "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to

---

**28.** Because we find that the superior court's finding of abandonment was supported by the record, we need not consider the court's additional finding regarding neglect.

**29.** AS 47.10.088(a)(2).

prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate...."[30] The state is specifically tasked to identify and actively offer appropriate family support services to the parent.[31] Additionally, when "making determinations and reasonable efforts under this section, the *primary consideration is the child's best interests.*"[32] Similarly, with regard to reasonable visitation, the state is asked to "consider the nature and quality of the relationship that existed between the child and the family member before the child was committed to the custody of the department."[33] In determining reasonable efforts, we permit the state to consider the "amount of time available" for reunification, considering how long the child has been in foster care and whether allowing more time for reunification would not be in the child's best interests.[34]

■ We first consider Jeff's contention that the state failed to make reasonable efforts during the first year of Jasmine's life—that is, in locating Jeff and establishing him as the natural father. Jeff claims that he did not know about the pregnancy and that he first learned of Jasmine's existence on January 30, 2002, almost one year after the birth. During that year, Melanie and Jimmy stipulated that probable cause existed that Jasmine was a child in need of aid when she was eight days old and later stipulated that Jasmine was a child in need of aid; in addition, the state had managed case plans for Melanie and Jimmy and had worked toward permanent placement for Jasmine with the foster family. Throughout this time, the state acted under the reasonable assumption that

Jimmy was the natural father. Not only had he been named as the father at birth, but he accepted that role and repeatedly participated in the court proceedings as father. Once Jimmy was excluded as the father, the state obtained paternity results from Jeff's DNA in less than two months. Once Jeff's paternity was established, the state mailed him a summons regarding the case proceedings in about one month. (The case worker apparently did not have a phone number or any other means to communicate with him.) While there is no such thing as "too soon" for communications of such a critical nature, we cannot conclude that these delays before first contact were so unreasonable as to necessitate a reversal of the termination.[35]

■ More important to our inquiry are the efforts made by the state once Jeff's paternity was established. Though the state's efforts toward reuniting Jeff with his daughter were not exemplary, neither were they unreasonable. The state notified him in writing of the permanency hearing in February.[36] The social worker returned his calls, gave him information regarding the child and the foster parents, mailed him documents relating to the child, offered him the opportunity to speak with the foster mother and participate in an administrative review hearing on May 9 (which he declined), gave the foster mother Jeff's phone number and requested that she call him, gave Jeff another opportunity to participate in an administrative review in November (which he also declined), and set up an open-ended visitation schedule for Jeff with Jasmine during his January 2003 visit to Anchorage. In addi-

---

**30.** AS 47.10.086(a).

**31.** *Id.* at (a)(1)-(2).

**32.** *Id.* at (f) (emphasis added).

**33.** AS 47.10.080(p).

**34.** *G.C. v. State, Dep't of Health & Soc. Servs.,* 67 P.3d 648, 653 & n. 23 (Alaska 2003).

**35.** We also note that Jeff's absence during Jasmine's first year is not the fault of the state. Jeff knew that he had engaged in sexual relations with Melanie. Jeff violated his parole, which led to his incarceration during a significant portion

of Melanie's pregnancy. Finally, Jeff took no steps while in prison or after his release to determine whether he had fathered a child, despite being told by Melanie that she thought she was pregnant.

**36.** Jeff did not respond to this notice or appear at the hearing. At that hearing, with only the mother present, the court ordered the state to file a petition for termination against both parents by March 13. The state complied with this order. By attending this hearing (either at the initial scheduled time or through a postponement), Jeff could have quickly asserted an interest in parenting the child and changed the course of the proceedings.

tion, in May 2002 the social worker set up a case plan with the concurrent goals of (1) reuniting Jeff as father of Jasmine; and (2) permanently placing Jasmine with the foster family.

Despite these activities, there is also some evidence in the record supporting Jeff's position that the state was slow in contacting or responding to him and that it favored the goal of placing Jasmine with the foster family. However, the record strongly supports the view that Jeff never demonstrated a desire to parent or otherwise be involved in the child's life, as discussed in the previous section. Because the state is asked to consider the prior relationship between the parent and child, the temporal urgency of achieving permanent placement, and the child's best interests, we conclude that the state, in determining what efforts to reunite parent and child are "reasonable," may consider the parent's actions. Here, Jeff never remotely committed to the job of parenting Jasmine.[37] In these situations, the law—as well as common sense—does not dictate the state to force him, against his will, into accepting the job. In light of these circumstances, we are satisfied that the state's efforts in this case to reunite Jeff with Jasmine were reasonably calibrated to the interest in parenting demonstrated by Jeff. The superior court's conclusion that the state made reasonable efforts was therefore not in error.

### D. The Superior Court Did Not Err in Finding that Termination Was in the Child's Best Interests.

Finally, Jeff contends on appeal that the court erred in finding that the termination was in the child's best interests because he was not responsible for the conditions that led to Jasmine's medical problems and CINA adjudication and he has followed his case plan and developed a healthy life-style in Pennsylvania. While parental rights cannot be terminated solely on "best interests"—the state must first satisfy the test of showing some harmful parental conduct—the statute states that "the court shall consider the best interests of the child" during the proceedings.[38] The superior court concluded that "[i]t is in Jasmine's best interests to terminate parental rights and free her for adoption by the [J] family."

Numerous factual findings by the court support its conclusion that it is in Jasmine's best interests to remain with the foster family. These findings are supported by the record. Jasmine has resided with the family since the second week of her life and has developed strong emotional attachments to them and the court heard testimony underscoring the strength of the bond created in the earliest years of childhood. The foster family has been exemplary in the amount of care and affection given to Jasmine throughout her life, and they now wish to adopt her. Moreover, testimony indicated that Jasmine continues to have developmental problems demanding substantial care, and that these problems may well worsen upon a change in lifestyle as severe as being separated from her foster parents. There is other support as well: Melanie (though she has since relinquished her parental rights) testified that she did not want Jasmine returned to Jeff or his relatives, casting doubt on his parenting ability, and there was little evidence to demonstrate that Jeff has the capacity, experience, or willingness to properly raise the child.[39] The superior court's conclusion that termination was in the best interests of Jasmine was therefore not clearly erroneous.

## V. CONCLUSION

Because Jeff's due process rights were not violated and because the superior court's findings regarding abandonment, reasonable

---

**37.** Indeed, eleven months after learning of Jasmine's existence, he sent no Christmas present or greeting to her. At his first-ever visits with her the following month, he was distracted and inattentive.

**38.** AS 47.10.088(c).

**39.** For example, while complying with the case plan in other respects, he failed to complete those requirements specific to Jasmine—such as familiarizing himself with her or her medical needs. The evidence also shows a continual anger problem. In addition, his parenting plans center upon asking his sister (a Las Vegas resident) to come to Pennsylvania to help parent the child.

efforts, and best interests were supported by the record, we AFFIRM the superior court's termination of Jeff's parental rights.

MATTHEWS, Justice, not participating.

BRYNER, Chief Justice, concurring.

I join in the court's judgment and agree with the result reached on all of the issues; but I disagree with its rationale in deciding the issue of procedural due process. Specifically, I disagree with the court's suggestion that Jeff's right to due process could be met without adjudicating the state's allegation that his conduct since being identified as Jasmine's father amounted to abandonment and neglect of Jasmine; I would decline to say, as the court does, "that Jeff did not have an absolute right to participate in an adjudication hearing" on these CINA allegations.[1] I find no occasion to decide this difficult issue here, because, in my view, the record shows that the termination trial gave Jeff a full and fair adjudication hearing on the issue of Jasmine's current CINA status: in deciding to sever Jeff's parental ties, the superior court necessarily determined that his conduct since learning that he was Jasmine's father amounted to abandonment and neglect of his daughter and rendered her a child in need of aid.

To terminate Jeff's parental rights under AS 47.10.088(a), the state was required to prove, among other things, that Jasmine had been subjected to conduct or conditions that caused her to be a child in need of aid under AS 47.10.011. Conceivably, the state might have attempted to meet this requirement by relying solely on Jasmine's previous CINA adjudication, which resulted from Melanie's substance abuse and neglect, and was entered without notice to Jeff. But the state did not take this course; instead, it advanced new CINA allegations as a basis for terminating Jeff's rights. The petition for termination alleged that Jasmine had been subjected to conduct or conditions making her a child in need of aid because Jeff had abandoned and neglected her.[2] Because these allegations had not been included in the orig-

inal CINA proceeding, they could not have been established by reliance on the original CINA adjudication; the state would have to prove that Jeff engaged in conduct that met the statutory definition of abandonment and neglect, and thereby rendered Jasmine a child in need of aid.

The state pinpointed its basis for advancing these claims well in advance of Jeff's termination trial. Two months before trial, the state filed a detailed pretrial memorandum elaborating the evidence that it intended to rely on to prove abandonment and neglect. The memorandum made it clear that the state would seek to show that Jasmine was a child in need of aid because of abandonment and neglect by Jeff that occurred after he learned that he was Jasmine's father. In summarizing the state's theory on this point, the pretrial memorandum stated:

> There is clear and convincing evidence that this child was born a child in need of aid, in part, because of her father's incarceration. After her father knew of his paternity, and after his release from jail, his conduct toward this child constitutes neglect as defined in AS 47.10.014 and abandonment as defined in AS 47.10.013(a)(2) and (3).

Jeff unquestionably understood that the state was advancing these new CINA theories and that the court would be required to adjudicate the allegations of abandonment and neglect as part of the termination trial. At the outset of the termination trial, Jeff moved to dismiss the petition for termination, arguing that termination would be premature because Jasmine's current status as a child in need of aid had not yet been adjudicated. Contending that the court could not terminate his parental rights unless the state first proved its new CINA allegations, Jeff asked the court to bifurcate the proceedings so that the CINA allegations would be adjudicated first, to be followed by a trial on the issue of termination only if the state prevailed on the adjudication.

Jeff also insisted that, in the interim, Jasmine should be placed in his custody. Noting that he had not had an opportunity to

---

1. Op. at 704.

2. *See* AS 47.10.011(1).

participate in the earlier adjudication proceeding, Jeff reasoned that the state lacked jurisdiction to keep Jasmine in its custody pending the new adjudication hearing unless it could show probable cause that she continued to be a child in need of aid despite Jeff's availability to serve as her father. Since the state had no evidence to show probable cause, Jeff claimed, it lacked jurisdiction to retain custody of Jasmine.[3]

The state opposed Jeff's last-minute motion to dismiss. Addressing Jeff's jurisdictional argument first, the state pointed out that the initial CINA adjudication validly placed Jasmine in state custody despite Jeff's lack of participation, since the adjudication was entered before his paternity was established. And because the custody order remained in effect, the state argued, no showing of probable cause was required, and Jasmine could properly remain in state custody pending trial on its petition for termination.

As to Jeff's demand to bifurcate the adjudication and termination proceedings, the state insisted that separate hearings were not required by applicable law: AS 47.10.088(g) expressly authorizes the state to include new CINA allegations in a petition

for termination;[4] and CINA Rule 18(b) specifically gives the superior court discretion to consolidate the adjudication of these new allegations with the trial on the state's petition for termination.[5] Relying on these provisions as well as on existing case law,[6] the state contended that the new CINA allegations pertaining to Jeff could be adjudicated in the context of his trial on the petition for termination.

By the time the state filed its opposition to Jeff's motion to dismiss, the termination trial was already in progress; the superior court denied Jeff's motion summarily and proceeded with the trial. In conducting the trial, the superior court implicitly recognized that the case presented mixed questions of adjudication and termination. In response to a motion by Jeff, the court indicated that it intended to enforce the provisions of CINA Rule 18(f) when ruling on the admissibility of hearsay evidence. Rule 18(f) adopts a two-tiered standard for hearsay in termination trials: the rule allows reliable hearsay to be admitted for most purposes, but it requires compliance with the formal hearsay exceptions set out in the Alaska Rules of Evidence when hearsay is offered to prove an issue relating to adjudication.[7] By invoking Rule

**3.** Jeff separately argued that if the court found sufficient evidence to prove Jasmine's present status as a child in need of aid, it should dismiss the petition in any event, because the state lacked sufficient evidence to establish that it had made reasonable efforts to reunify Jasmine with Jeff.

**4.** AS 47.10.088(g) provides:

This section does not preclude the department from filing a petition to terminate the parental rights and responsibilities to a child for other reasons, or at an earlier time than those specified in (d) of this section, if the department determines that filing a petition is in the best interests of the child.

**5.** CINA Rule 18(b) provides:

Purpose of Hearing. The termination hearing is a disposition hearing to the court on the question of whether the parental rights to an adjudicated child in need of aid should be terminated. Upon a showing of good cause and with adequate notice to the parties, an adjudication hearing and a termination hearing may be consolidated.

Alaska Rule of Civil Procedure 42(a) grants similar authority to the superior court in more general terms:

Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

A motion requesting consolidation shall be filed in the court where the case is sought to be consolidated. The motion shall contain the name of every case sought to be consolidated. A notice of filing together with a copy of the motion shall be filed in all courts and served on all parties who would be affected by consolidation.

**6.** Specifically, the state claimed support by analogy in two prior cases: *P.M. v. State, Dep't of Health & Soc. Servs.*, 42 P.3d 1127 (Alaska 2002), and *T.F. v. State, Dep't of Health & Soc. Servs.*, 26 P.3d 1089 (Alaska 2001).

**7.** Under CINA Rule 9, the Alaska Rules of Evidence apply to CINA proceedings unless otherwise provided in the CINA Rules. CINA Rule 15, which governs CINA adjudication hearings, makes no other provision. But CINA Rule 18, which governs termination trials, sets forth an exception in subsection 18(f):

18(f), then, the court unmistakably demonstrated its belief that Jeff's trial presented consolidated issues involving both adjudication and termination.

After completing the termination trial, the superior court issued a seventeen-page decision terminating Jeff's parental rights. Much, if not most, of its decision was devoted to findings describing pretrial conduct by Jeff amounting to abandonment and neglect.

On appeal, Jeff argues that his right to procedural due process was violated by these proceedings because he could not be legally bound by the prior CINA adjudication order, which was entered without his participation, and because he was not given an opportunity to be heard on the issue of whether Jasmine should be adjudicated as a child in need of aid at the time of the trial.

This due process claim can be seen as raising several discrete issues. To the extent that it simply asserts the right to have a bifurcated proceeding—to have the new CINA allegations and the termination issues determined one after the other, so that the questions of neglect and abandonment could be adjudicated first, today's opinion correctly recognizes that Jeff's argument lacks legal basis. The Alaska Statutes and our CINA Rules expressly allowed the superior court to conduct a consolidated hearing encompassing the new CINA allegations, as well as the petition's other allegations relating specifically to termination.

Similarly, Jeff's argument lacks legal merit insofar as it suggests that he received inadequate notice of the new CINA allegations. The petition for termination and the state's pretrial memorandum unequivocally spelled out the state's intent to prove that Jasmine was a child in need of aid because of abandonment and neglect by Jeff occurring after he learned that he was her father. And as already mentioned, the record confirms that Jeff understood these new allegations and

had a full opportunity to defend against them during the termination trial.

Finally, to the extent that Jeff seeks to claim that the superior court based its termination order on the prior CINA adjudication, instead of grounding it on new allegations of abandonment and neglect, Jeff's claim simply has no factual basis. When viewed as a whole, the petition for termination, the state's pretrial memorandum, the evidence at trial, and the superior court's written decision convincingly establish that the termination of Jeff's parental rights had little to do with the conduct by Melanie addressed in the prior CINA adjudication. Jeff's rights were terminated because he abandoned and neglected Jasmine after being identified as her biological father, and because the superior court found as a result of this conduct that placing Jasmine with Jeff would expose her to serious emotional harm.

The superior court's findings effectively covered all elements needed to adjudicate Jasmine as a child in need of aid because of abandonment and neglect by Jeff. In fact, they *necessarily* included all the required elements of a CINA adjudication: given CINA provisions cited in the petition for termination and the evidence outlined in the state's pretrial memorandum, the court could not have found a basis for terminating Jeff's parental rights under AS 47.10.088 without also specifically finding—by a standard of proof more stringent than the one required for adjudication—that Jeff neglected and abandoned Jasmine after he knew that he was her father, that he refused to alter this conduct, and thus prevented her from being placed in his custody without risking serious harm.

In short, the petition for termination and pretrial memorandum gave Jeff clear notice that all necessary elements for a CINA adjudication would be tried; the parties fully addressed these elements at trial; and the superior court's termination decision squarely adjudicated them. It would exalt form

Evidence. Hearsay that is not admissible under a recognized exception to the hearsay rule is not admissible at a trial on a petition to terminate parental rights to prove that the child has been subjected to conduct or conditions described in AS 47.10.011. Otherwise, hearsay may be admissible at the trial if it is probative of a material fact, has circumstantial guarantees of trustworthiness, and the appearing parties are given a fair opportunity to meet it.

over substance to suggest that the superior court's failure to formally label its ruling a "CINA adjudication" disqualifies it from being recognized for what, in substance, it actually is: a consolidated decision incorporating a CINA adjudication and a termination order. Because this interpretation disposes of Jeff's due process claim without relying on the prior adjudication, I see no need to guess whether or when a termination might properly be based on a prior CINA adjudication handed down without notice to the parent whose rights the state seeks to sever. The court's speculative discussion of this point strays beyond the facts of Jeff's case, needlessly stretches the law, and, in my view, is sure to invite confusion and error in future CINA proceedings.