NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STEPHEN H., | ) | |
| | ) | Supreme Court No. S-14257 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| v. | ) | 3AN-08-00401/402 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1400 - November 30, 2011 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, Christen, and Stowers, Justices.

I.     INTRODUCTION

This appeal arises from a child in need of aid (CINA) case involving two special needs children. Both parents have recurrent alcohol abuse problems that impact their ability to provide adequate caregiving for their children. After attempting to implement two different safety plans aimed at keeping the children in their parents' care,

---

\*     Entered pursuant to Alaska Appellate Rule 214.

the State took custody of the children and placed them into foster care. Over two years later the State moved to terminate parental rights. The father appeals the superior court's order terminating his parental rights, arguing that the superior court erred in all required findings. We affirm the termination of the father's parental rights because the record contains sufficient evidence to support the superior court's findings.

## II. FACTS AND PROCEEDINGS

### A. Facts

Stephen and Camille H. are the parents of Joshua (born in 2001) and Derrick (born in 2003).[1] Both children are Indian children as defined by the Indian Child Welfare Act (ICWA).[2] Both suffer developmental delays and require special care.

Joshua has been diagnosed with static encephalopathy (non-progressive brain dysfunction). This condition has various causes, including in utero alcohol exposure and early life experiences. At the time of the trial Joshua was in the third grade, but his foster mother believed that he had the mental processing ability of a three- or four-year old. This includes difficulty understanding the concept of time and, organizing multiple-step tasks without reminders, and requires a structured schedule. Proper management of Joshua's needs requires stability and security. At the time of the trial Joshua was in good health, although upon removal from Stephen and Camille's care he was in need of vision and dental care.

Joshua was placed with a non-ICWA-compliant foster home in April 2009 after placement with an aunt and uncle failed because Camille continually called the home in an intoxicated state. His foster family would like to adopt him. They are open

---

[1]    We use pseudonyms throughout this opinion to protect the privacy of the family.

[2]    25 U.S.C. § 1903.

to visits with Joshua's brother and continued contact with his biological parents and tribe. However, at the time of trial there had not been any contact between the brothers outside the visits set up by the Office of Children's Services (OCS).

Derrick is the younger son and suffers from significant physical, developmental, and cognitive deficits as a result of an idiopathic chromosomal abnormality. He gets sick often, has brittle bones, and requires 24-hour attention. Derrick is unable to eat solid foods; he is fed through a gastronomy tube (G-tube). He still wears diapers and is susceptible to bowel obstruction and other digestive problems. Derrick attends school but is on what his foster mothers refers to as a "life plan"; he is not expected to graduate but is taught basic life skills. He has a 15-20 word vocabulary. He usually moves around by military-style crawling, but has a wheel chair and is working towards using a walker. Derrick receives physical, occupational, and speech therapy multiple times per week at home and school. Derrick is unlikely to be able to live independently and will require increasingly challenging care as he grows older.

Due to Derrick's considerable medical needs he was placed with an appropriate non-ICWA-compliant foster home. At the time of removal from Stephen and Camille's custody, Derrick's G-tube insertion site was bleeding occasionally and the skin around the site was peeling, causing pain during normal activities. He weighed 24 pounds despite being five years old. Additionally, he was lethargic and took three or four naps a day. At the time of trial Derrick was 50 pounds and interacted with the other children and pets in the foster home. Derrick's foster family is interested in adopting him. His foster mother is open to contact with Derrick's tribe but she was not asked about maintaining contact with his brother or natural parents.

1. **Parent-child interactions**

The boys were removed from the home while Stephen was incarcerated.[3] During incarceration Stephen was able to keep in contact through visits every several weeks, phone calls, and letters. Despite several attempts to schedule visits, Camille did not see her children until after Stephen was released. After Stephen's release, both Stephen and Camille attended regular visits with the children. Several visits were cancelled for various reasons but overall visitation occurred regularly.

Initially the children were reserved and tense, especially towards Camille, but later the visits became more comfortable. Both Stephen and Camille engaged in proper activities with their children. Multiple observers noted that Stephen and Derrick have a special bond. Both children appeared to look forward to the visits and were happy to see their parents.

### 2. Interactions with OCS

Both Stephen and Camille have a long history of alcohol abuse. Stephen reports heavy use from age 28. He has been diagnosed with episodic alcohol dependence. In July 2008, Stephen was arrested for driving under the influence and lost his job as a truck driver; he has not worked since that time. Camille has been unemployed since August 2007. In early 2010, the family's home was foreclosed upon. At the time of trial, Stephen and Camille remained married and resided at a shelter.

On November 17, 2008, the police responded to a report that Stephen and Camille were intoxicated while the children were in their care.[4] According to a breathalyzer test administered at the scene, Camille had a .310 percent breath alcohol content and Stephen a .123 percent breath alcohol content. The police waited for a sober

---

[3] Stephen was incarcerated as a result of a December 6, 2008 alcohol-induced domestic violence incident.

[4] Prior to that date there were three other reports. Two were deemed unsubstantiated and one resulted in a referral to Cook Inlet Tribal Council.

relative to arrive and forwarded the case to OCS. OCS developed a safety plan and referred Stephen and Camille to substance abuse assessments and parenting classes.

In early December 2008, Stephen was arrested during a domestic dispute that involved alcohol. As a result he was incarcerated until April 2009. Because Camille admitted to drinking, OCS implemented a new safety plan. Under that plan, Camille's mother agreed to move into the home if Camille did not drink. Later that month, Camille's mother notified OCS that she would be leaving because Camille had been drinking. Stephen's incarceration left the children with no safe caregivers, and so OCS took custody.

In April 2009, Stephen and Camille stipulated that the children were in need of aid under AS 47.10.011(10). The OCS caseworker reported that she met with Stephen and Camille at least once or twice a month beginning in November 2009.[5] OCS twice referred the family to the Family Care Court. Each time they were rejected. After the final rejection, OCS changed the case goal from reunification to adoption.

### 3.       The case plan

Under the OCS plan, Stephen was required to attend substance abuse classes, anger management classes, and parenting classes; in addition, OCS arranged visitations with his children. Stephen's participation in these required classes was complicated by his incarceration, but upon release Stephen entered into and completed Father's Journey Program, a parenting class, and an anger management course. Additionally, in July 2009 he began an outpatient alcohol abuse treatment program. He was discharged from the program three months later because he missed classes. This caused him to "dr[i]nk for a week straight," because he thought he would be unable to

---

[5]       Prior to that time the case had been assigned to another caseworker in the same unit.

get his children back. He returned for an additional assessment later that year to reenter the outpatient program. Despite recommendations he did not seek treatment at that time.

In July 2010, Stephen entered a residential treatment program. Although he completed the program, his primary counselor was concerned that he had not internalized the treatment and was at risk of relapsing. After completing the program, he agreed to participate in outpatient care, but did not actually do so. In October 2010, Stephen and Camille sought substance abuse assessments because they continued to drink. At the time of trial Stephen had made no further efforts to seek treatment and had been involved in an alcohol-related incident with the police in February 2011.

Camille's plan was similar, including parenting classes and substance abuse assessment requirements. Camille completed Cook Inlet Tribal Council's Mothers Program. In June 2009, she completed a substance abuse assessment. Camille failed to follow the recommendations for residential treatment and was picked up by the Community Services Patrol for public intoxication several times over the next six months. In December 2009, she attempted to enter the Stepping Stones residential treatment program. However, the program required that OCS commit to placing Joshua with Camille shortly after treatment commenced; OCS was unwilling to do so and Camille was unable to enter the program. In February 2010, Camille participated in a detoxification program and completed a 45-day residential treatment program. Camille did not participate in aftercare services and relapsed. She entered a transitional housing program but was discharged for non-compliance. She later entered another detoxification program, but did not enter treatment. In January 2011, she participated in another alcohol abuse assessment and it was recommended that she enter a long-term residential program. At the time of trial she had not yet done so.

The OCS caseworker also attempted to assist with job searches and housing needs. The caseworker discussed places where each might apply for jobs, but Stephen

and Camille said they needed lockers at the shelter before they could apply and attend interviews. The caseworker attempted to facilitate the storage needs.

## B. Proceedings

The termination of parental rights trial occurred on March 7, 2011. Pursuant to AS 47.10.088, the superior court terminated Stephen and Camille's parental rights and committed the children to the custody of OCS for the purpose of adoption after making all required findings.[6] Stephen appeals, arguing that the court erroneously found (1) that the children were in need of aid under AS 47.10.011(10); (2) that he failed to remedy conduct that puts the children at substantial risk of harm; (3) that OCS made active efforts to reunite the family; (4) that return to his care would likely cause serious harm; and (5) that termination of his parental rights was in the best interests of the children.

## III. STANDARD OF REVIEW

In a CINA case we review the superior court's factual findings for clear error.[7] We will reverse only if left with "a definite and firm conviction that a mistake has

---

[6]  The superior court found by clear and convincing evidence that the children were in need of aid under AS 47.10.011(10), that the parents failed to remedy the conduct or conditions that put the children at risk of harm, and that "reasonable and active efforts" had been made to prevent the break up of the Indian family. The superior court also found beyond a reasonable doubt, supported by qualified expert testimony, that returning the children to the parents' custody was likely to result in serious emotional or physical harm to the children. Finally, the superior court found by a preponderance of the evidence that termination of parental rights was in the children's best interests.

[7]  *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

been made."[8] "When reviewing mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[9]

## IV.    DISCUSSION

### A.    The Superior Court Did Not Err In Finding That Joshua And Derrick Were In Need Of Aid Because Sufficient Evidence Showed That Stephen's Drinking Impaired His Ability To Parent And Caused A Substantial Risk Of Harm To Both His Children.

In order to terminate parental rights under AS 47.10.011(10), the trial court must find by clear and convincing evidence that a parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the . . . use of the intoxicant has resulted in a substantial risk of harm to the child."[10] The superior court found that the children were in need of aid, relying on the extensive evidence of alcohol abuse and the failure to remedy that addiction.

Stephen argues that the superior court held him responsible for the impact his wife's drinking had on his children. He points out that most of the evidence related to Camille's chronic and unabated drinking problem. While acknowledging that there was some evidence presented regarding the negative impacts of his alcohol use, he insists that this did not establish that he was a habitual user such that he created a risk of harm to his children. He describes his alcohol addiction as episodic and requiring only low-

---

[8]    *Id.*

[9]    *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009) (citing *A.M. v. State*, 945 P.2d 296, 304 n.10 (Alaska 1997)).

[10]    AS 47.10.011(10); AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

level treatment.[11] He further argues that the "weak and largely irrelevant" evidence of his drinking, such as the February 2011 incident, involved times when the children were absent. Stephen argues that other evidence lacked specificity and did not show an impairment of his ability to parent or a substantial risk of harm. His final argument is that AS 47.10.019 precludes the court from finding his children in need of aid.[12]

When viewed in the light most favorable to the State, as required by our standard of review,[13] the record contains substantial evidence supporting the superior court's conclusion that Stephen's ability to parent was substantially impaired and this created a substantial risk of harm to the children. Stephen's alcohol problems are long-term, substantial, and as of yet not fully treated. Certainly, the family's problems were exacerbated by Camille's drinking, yet Stephen's alcohol abuse problems also contributed to the overall failure to provide adequate care. Moreover, Camille's drinking had a negative impact on Stephen's alcohol abuse since she was a trigger for his drinking.

---

[11] Stephen downplays the seriousness of his alcoholism by suggesting it is episodic and required low intensity treatment based on the January 2010 assessment. But six months later when he entered treatment, his recommended level of care was medium intensity treatment.

[12] AS 47.10.019 provides that "the court may not find a minor to be a child in need of aid under this chapter solely on the basis that the child's family is poor, lacks adequate housing, or exhibits a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives." But the statute also provides that "this section may not be construed to prevent a court from finding that a child is in need of aid if the child has been subjected to conduct or conditions described in AS 47.10.011- 47.10.015."

[13] *See Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).

The record shows the impact Stephen's alcohol abuse had on his family. His drinking cost Stephen his job, which directly caused the family to endure serious financial problems, ultimately including their loss of housing. Moreover, while not attributable solely to Stephen, both children had significant medical and psychological needs when OCS obtained custody. Derrick was malnourished and his G-tube had not yet healed, while Joshua lacked basic dental and vision care. This shows that not only was there a risk of harm but also that there was actually harm to the children while Stephen was responsible for their care.

Even if evidence of Stephen's drinking was minimally important, which it was not, we have repeatedly found that the acts of one parent may support a finding that a child is in need of aid.[14] Nonetheless, this case does not present facts where the acts of one parent were the sole cause of the CINA finding. Both parents had substance abuse problems and were unable, together or alone, to properly care for the children.

Stephen cites *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*[15] to suggest that the superior court erred because there were no specific instances of his inability to parent. This argument is unpersuasive. In *Lucy J.*, we listed specific instances of the mother's conduct to show the risks of harm to her children, but we did not require any particular findings.[16] The statutory standard is whether substance abuse substantially impaired the parent's ability to parent and whether

---

[14]    *See, e.g.*, *Jeff A.C., Jr. v. State*, 117 P.3d 697, 703 (Alaska 2005) (finding that a father did not have an absolute right to participation in a CINA adjudication prior to termination because the focus was the child); *A.H. v. State*, 779 P.2d 1229, 1232 (Alaska 1989) (finding that "other parent's acquiescence or fault in allowing [sexual] abuse to occur is not required in order to find the child to be in need of aid").

[15]    244 P.3d 1099 (Alaska 2010).

[16]    *Id.* at 1112.

the use of the intoxicant resulted in a substantial risk of harm to the child.[17] Stephen's argument improperly focuses the inquiry on himself. In a CINA case, the primary focus is the child.[18] Once the inquiry is refocused on Joshua and Derrick, it is evident that Stephen's substance abuse substantially impaired his ability to parent and created a substantial risk of harm to the children.

Finally, Stephen incorrectly suggests that AS 47.10.019 applies to this case. Alaska Statute 47.10.019 applies where the parent's economic circumstances were the sole basis for a CINA finding. Here, the economic situation illustrated the depth of Stephen's alcohol abuse, but it was not the basis for the CINA finding. The superior court was not precluded from finding Derrick and Joshua to be children in need of aid.

In sum, we conclude that the superior court's findings were not clearly erroneous and that Derrick and Joshua were children in need of aid under AS 47.10.011(10).

B.      **The Trial Court Did Not Err In Finding That Stephen Failed To Remedy The Conduct That Placed The Children At Substantial Risk Of Harm.**

The superior court found that due to the inadequately addressed alcohol abuse problems and the evidence showing that these were "desperately needy children," both parents were unable to properly care for the children. Stephen's continuing alcohol problems and his continual involvement with Camille, a main trigger for his alcohol use, supported the finding that Stephen failed to remedy the conduct that placed the children at risk. The superior court may consider any fact relevant to the child's best interests

---

[17]    AS 47.10.011(10).

[18]    *Jeff A.C., Jr.*, 117 P.3d at 703.

when finding that the parent has not remedied the conduct or conditions that placed the child at substantial risk of harm.[19]

Stephen argues that to the extent that his conduct put his children at risk, he made substantial efforts to remedy it. He asserts that he substantially complied with OCS requirements by attending parenting classes, maintaining consistent visits with his children, and completing residential treatment. Additionally, Stephen argues there is no evidence that he will be unable to care for his children once he has secured a job and housing. Finally, he argues that it was not his conduct, but rather the Family Care Court rejection, that precipitated the termination proceedings.

We disagree. There is ample evidence that Stephen's alcohol abuse is a major obstacle to proper care of his children and places his children at risk of harm. Second, we have held that compliance with an OCS case plan does not preclude a "failure to remedy" finding.[20] Further, although Stephen characterizes his completion of a residential alcohol abuse program as compliance, there was evidence, credited by the superior court, that he had relapsed. His inability to remain sober satisfies the statutory requirements. In that light, his suggestion that he would be able to care for his extraordinarily needy children if he obtains housing and a job is unavailing. Finally, the decision to terminate parental rights was a result of several factors relating to reunification, including the second rejection from Family Care Court. Overall, the

---

[19]     AS 47.10.088(a)(2); AS 47.10.088(b); CINA Rule 18(c)(1)(A).

[20]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) (formal compliance with her case plan and sobriety after the birth of her child did not mean that a mother had adequately remedied her conduct); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 848 (Alaska 2009) (attending programs while in prison did not preclude a finding that a father had failed to remedy his conduct even though it was the mother's actions that predominantly placed the children at risk of harm).

superior court properly found that there was clear and convincing evidence that Stephen had failed to remedy his conduct.

## C. The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.

Under the Indian Child Welfare Act the superior court must find that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[21] There is no formulaic method for distinguishing between active and passive efforts, but we look to all services provided to the family.[22] The superior court found that OCS actively engaged with the family, providing continuing support towards reunification by maintaining consistent meetings, arranging for substance abuse assessments, providing bus passes, assisting with logistics relating to job searches, and making referrals to various programs.

Stephen argues that there were no efforts made to assist him individually. Stephen contends that OCS failed to "understand and assess" his situation and that he could have become the primary caregiver if OCS had taken a more active role in his case. He further argues that OCS failed to make proper efforts to place the children in ICWA-compliant homes.

The State contends that OCS made active efforts to rehabilitate and reunify Stephen with his family. The State also asserts that efforts directed towards Camille and the children are relevant in an "active efforts" assessment. The State argues that OCS's efforts to obtain addiction support for Stephen and Camille and services for the children meet the "active efforts" requirement.

---

[21] 25 U.S.C. § 1912(d) (2006).

[22] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008); *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

We agree with the State. First, the State's efforts towards Camille and the children were relevant in the "active efforts" determination.[23] Throughout OCS's involvement, there were many efforts to rehabilitate both Stephen and Camille and reunify the family. These efforts included consistent communication from OCS, referrals to parenting classes and substance abuse assessments, the development of a urinalysis regime designed to encourage sobriety, and referrals to housing agencies. An OCS caseworker spoke with staff at the residential treatment center where Stephen underwent treatment. The caseworker also called the shelter to assist Stephen in obtaining storage space to facilitate job interviews. She referred the family to Family Care Court a second time even though it was outside the normal procedures. There is sufficient evidence to support a finding that active efforts were made.

Stephen's argument that OCS failed to properly locate ICWA-compliant placements for the children also fails.[24] First, OCS did identify both Stephen and Camille's parents as supportive, but they were unable or unwilling to care for the children. Second, the children's special needs made it difficult to place the children in

---

[23]    *Dashiell R.*, 222 P.3d at 850; *see also Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010) (citing *Maisy W.*, 175 P.3d at 1268) (a court should look at OCS involvement in its entirety).

[24]    We note an apparent conflict in our developing case law regarding the role of ICWA-compliant placement in termination proceedings. *Compare Jacob W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1319, 2008 WL 5101809, at *9 (Alaska, Dec. 3, 2008) (placement preferences not relevant in best interests analysis) *with Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 764 (Alaska 2009) (addressing placement decisions in active efforts analysis). We decline to address this issue here because OCS did not fail to pursue ICWA-compliant placements. In this context the placements were appropriate due to the special needs of the children and the failed attempt to place Joshua with his maternal aunt.

an ICWA-compliant home. Notably, the children's tribe approved of the placement. Finally, Joshua was placed with a relative, but that failed due to Camille's behavior.

The superior court did not err in its active efforts finding.

**D.     The Superior Court Did Not Err In Concluding That If The Children Were Returned To Their Father's Care They Would Likely Suffer Serious Harm.**

To terminate parental rights under ICWA the court must find based on "evidence beyond a reasonable doubt that returning the child to the parent is likely to result in serious physical or emotional damage to the child."[25]  This finding must be supported by some, though not exclusively, expert testimony.[26]  "Proof that a parent's custody is likely to cause a child serious harm requires proof that (1) the parent's conduct is likely to harm the children and (2) the parent's conduct is unlikely to change."[27]  The superior court found that evidence provided by three qualified experts and two lay witnesses overwhelmingly established that the children would be at serious risk of harm if returned to their parents' custody.

Stephen argues that only one expert witness testified regarding his conduct and that "the lack of evidence supporting any previously inflicted harm whatsoever undercuts the prospective likelihood of serious [harm]."  Stephen characterizes the expert's testimony as positive.  Finally, he cites his special bond with Derrick and desire to care for his children to support the assertion that there is not proof beyond a reasonable doubt that harm would likely result if the children were returned to his care.

---

[25]     *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1019-20 (Alaska 2009) (citing 25 U.S.C. § 1912(f) (2006)).

[26]     *Id.*

[27]     *Id.* at 1020 (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

Stephen's argument is unpersuasive. The court heard the testimony of several expert witnesses and lay witnesses who addressed both Stephen's inability to internalize his treatment and the significant level of care the children require to remain healthy. First, Derrick's doctor, a qualified expert, and his foster mother testified regarding his serious medical needs and the daily challenges of providing care. A non-sober caregiver could pose a substantial risk not only of serious harm but of survival. While Joshua's needs are less complicated, they remain outside of the ordinary. His brain dysfunction requires stability and supervision to ensure he is able to perform daily tasks. Second, there is evidence of actual harm to the children. Both children required significant care upon removal from the home. Finally, Stephen's counselor at the residential treatment center testified that Stephen had failed to internalize the treatment and that he had failed to participate in outpatient services. This suggests his alcohol problems will continue.[28]

It was not clearly erroneous for the superior court to find that there was evidence beyond a reasonable doubt that the children were at serious risk of harm in Stephen's care.

### E. The Superior Court Did Not Err In Finding That It Was In The Children's Best Interests For Stephen's Parental Rights To Be Terminated.

Under AS 47.10.088(c) and CINA Rule 18(c)(3), the superior court must consider the best interests of the child in deciding whether to terminate a parent's rights. It is the best interests of the child, not the parent, that controls.[29] The superior court

---

[28] Indeed, his problems have not abated. He admitted to continued drinking problems, returned to Camille (a relapse trigger), and was involved in an alcohol-related incident after treatment.

[29] *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's*
(continued...)

found that due to Stephen and Camille's extensive alcohol abuse, the children's special needs, and the foster parents' desire to adopt the children, termination of parental rights was in the children's best interests.

Stephen argues that the superior court failed to consider his special bond with Derrick, his desire to care for the children, and the possibility that termination will sever the relationship between the brothers and their tribe. He points out that the boys have not yet visited each other outside the scheduled OCS visits.

Even though there was evidence that suggested that Derrick and Stephen shared a special bond, the children's best interests would be served by consistent and qualified care. The children's vulnerabilities and Stephen's inability to manage his alcohol addiction are supported by the record. The children have been in their foster homes for over two years. The foster parents desire to adopt the children and are able to provide the necessary care, including continuing the children's relationship with the tribe. Additionally, the lack of visits between the boys is attributed to scheduling conflicts, not a disregard of the importance of the sibling relationship. There is ample evidence that it is in the children's best interests that the court terminate Stephen's parental rights.

## V.  CONCLUSION

For the reasons discussed above, we AFFIRM the superior court's order terminating Stephen's parental rights.

---

[29]     (...continued)
*Servs.*, 182 P.3d 1110, 1116 (Alaska 2008).