G.C., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.

No. S–10519.

Supreme Court of Alaska.

April 11, 2003.

J. Randall Luffberry, Palmer, for Appellant.

Lance B. Nelson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Erica Kracker, Kracker Law Office, Palmer, for Guardian ad Litem.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The superior court terminated Gary Carson's [1] parental rights. Gary challenges the court's factual findings as erroneous and unable to support its termination decision. Because we believe the evidence supports the superior court's finding of abandonment, its decision that reasonable efforts were made to reunify Gary and his son Daniel, and its conclusion that termination would be in Daniel's best interests, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Cousins Gary Carson and Jana Bishop grew up in a small town in Colorado. As a teenager, Gary would occasionally babysit Jana and her siblings. One night at age thirteen, while babysitting, Gary smoked marijuana, consumed alcohol, and watched pornographic movies. Gary convinced Jana, then age four, to take off her clothes and the two "experimented with sex," meaning he put his penis inside of her and then stopped when she screamed. Jana told her mother, Claire King, what had happened, at which point Claire informed Gary's mother, Faye Simmons. Faye confronted Gary and then took him to the police station until she could have him admitted to the state hospital for treatment. Approximately three years later, Gary returned to his mother's home and lived there on and off for the next few years. During this time, he was heavily involved in drug use and criminal behavior and was arrested several times.

In the summer of 1990, Claire left several of her children, including Jana, with Faye while she went to work on a "Valdez clean-up boat." At that time, Jana was fourteen and Gary was twenty-three. According to Gary, Jana started to write letters to him, expressing a desire to have sex with him and to have his child. Faye expressed concerns about the living situation to Claire, who said they would discuss it during the holidays when she came to Colorado to visit. In the meantime, Faye had Gary move out of her house and into another house she owned on the same property.

In January 1991, after her mother had returned to Alaska, Jana began sneaking out of Faye's house and going next door to Gary's house. According to Gary, on two occasions, Jana came to his house, got into bed with him, and initiated sexual intercourse. On the first occasion, Gary claimed that he did not know what had happened until he woke up the following morning and found them in bed together, naked. The second time, Gary maintained that he was

1. Pseudonyms have been used for all family    members throughout this opinion.

drunk and stoned when Jana got into bed with him, and thinking it was his girlfriend, he had sex with her. Faye found out what was going on and told Gary he would have to move off the property. At some point after Gary moved out, Faye learned that Jana was pregnant. Jana then moved back in with her mother. Daniel was born on October 18, 1991.

Following Daniel's birth, Faye and Gary got occasional reports about Daniel from Claire and Jana, who preferred that Gary not take an active role in Daniel's life. Gary told Jana to call him if she needed help, but privately doubted if he would ever hear from her again. The Alaska Division of Family and Youth Services (DFYS) became involved with Jana and her two children, Daniel and Stacy,[2] in 1995. Faye was aware of some intervention, but claims she did not know that it was serious until Jana called her in October 2000 and informed Faye that DFYS was seeking to terminate Jana's parental rights. At that point, Daniel was in a pre-adoptive placement with the Peterson family and Gary was incarcerated in Colorado.

Faye then decided to inform DFYS that Gary was Daniel's father. Upon learning Gary's identity, DFYS requested that the Mesa County (Colorado) Department of Human Services perform a home study of Faye's house pursuant to the Interstate Compact on the Placement of Children (ICPC).[3] The study was completed on May 22, 2001; placement was denied on June 1, 2001. Through his attorney, Gary requested a reconsideration of the denial of placement, which was also denied. In the meantime, DFYS filed a petition to terminate his and Jana's parental rights. During this time, the Petersons changed their minds about adoption and Daniel was placed with a former foster parent named Ted Hughes, who was considering adoption pending the outcome of the termination proceedings.

## B. Proceedings

Jana voluntarily relinquished her parental rights to Daniel on August 15, 2001. Trial to terminate Gary's parental rights was held before Superior Court Judge Beverly W. Cutler in Palmer. Trial began on September 27, 2001, and was held on six separate days during the months of September, October and November. Gary testified in a video-taped deposition from the work release community corrections building in which he currently resides. He was present by phone for the duration of the trial. Trial was concluded on November 15, 2001. Judge Cutler issued oral findings from the bench at the close of trial, followed by written findings on January 25, 2002.

In its written findings, the trial court found by clear and convincing evidence that Daniel was a child in need of aid pursuant to three separate (and independent) parts of the law defining children in need of aid, that Gary had not remedied the conduct or conditions that placed Daniel at substantial risk of harm, that DFYS had demonstrated by a preponderance of the evidence that it had made reasonable efforts to provide remedial services and rehabilitative programs to Gary, and that termination of Gary's parental rights would be in Daniel's best interests. Accordingly, the trial court terminated Gary's parental rights and authorized DFYS to place Daniel for adoption.

Gary appeals, claiming that the court's factual findings were erroneous and that they were not sufficient to support the court's termination decision.

## III. STANDARD OF REVIEW

We apply the clearly erroneous standard when reviewing the factual findings supporting the termination of a parent's right to raise his or her children.[4] We will find clear error only when a review of the entire record leaves us "with a definite and firm conviction that the superior court has made a

---

**2.** Jana had a second child, Stacy, in 1994 with Colorado resident Darren Hunt. Stacy is currently with her maternal grandmother pending placement with her father.

**3.** AS 47.70.010.

**4.** *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002); *J.H. v. State, Dep't of Health & Soc. Servs.*, 30 P.3d 79, 85 (Alaska 2001).

mistake." [5] Whether the trial court's findings satisfy the requirements of the child in need of aid statutes and rules is a question of law which we review *de novo*.[6]

## IV. DISCUSSION

### A. The Trial Court Did Not Err in Finding that Sufficient Grounds Supporting the Termination of Gary's Parental Rights Existed.

■ Pursuant to AS 47.10.088, prior to terminating a parent's right to raise his or her child, the court must find by clear and convincing evidence (1) that the child meets one of the bases for being a child in need of aid under AS 47.10.011 and (2) either that the parent has not remedied the conditions underlying the original harm or that returning the child to the parent would place the child at substantial risk of physical or mental injury.[7]

Judge Cutler found by clear and convincing evidence that Daniel was a child in need of aid under three subsections of AS 47.10.011:(1), (2), and (9).[8] In addition, the court made findings that would support termination on the basis that Daniel was conceived as a result of child sexual assault under AS 25.23.180(c)(3).[9] Because we conclude that there was ample support for the court's finding that Gary abandoned Daniel,

we affirm the superior court's determination that there were sufficient grounds for termination of Gary's parental rights under AS 47.10.011(1). In doing so, we decline to review the court's findings under AS 47.10.011(2) or (9) or AS 25.23.180(c)(3), since one statutory basis is sufficient for finding a child to be in need of aid in a termination proceeding.

Alaska Statute 47.10.011(1) requires that the court find that the parent has abandoned his or her child within the meaning of AS 47.10.013. Subsection .013(a) provides in relevant part that:

> the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult.

The statute also provides specific examples of conduct that will be considered abandonment.[10]

■ We have interpreted the abandonment statute as encompassing a two-prong test: "(1) whether the parent's conduct evidenced a disregard for his or her parental obligations, and (2) whether that disregard led to the destruction of the parent-child relationship." [11] Additionally, it is clear that

---

5. *S.H.*, 42 P.3d at 1122.

6. *Id.* at 1123; *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001).

7. AS 47.10.088(a)(1).

8. AS 47.10.011 provides in relevant part that the court may find a child to be in need of aid if it finds that:

> (1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;
> (2) a parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child;
> . . . .
> (9) conduct by or conditions created by the parent, guardian, or custodian have subjected

the child or another child in the same household to neglect[.]

9. AS 25.23.180(c)(3) provides in relevant part:

> The relationship of parent and child may be terminated by a court order issued in connection with a proceeding under this chapter or a proceeding under AS 47.10 on the grounds . . . that the parent committed an act constituting sexual assault or sexual abuse of a minor under the laws of this state or a comparable offense under the laws of the state where the act occurred that resulted in conception of the child and that termination of the parental rights of the biological parent is in the best interest of the child.

10. *See* AS 47.10.013(a)(1)-(8) (listing factors such as failure to support, communicate with, or visit the child, and failure to participate in a reunification plan).

11. *E.J.S. v. State, Dep't of Health & Soc. Servs.*, 754 P.2d 749, 751 (Alaska 1988).

"abandonment is not determined by the parent's subjective intent or ... 'the parent's wishful thoughts and hopes for the child.'" [12] Rather, we apply an objective test to the actions of the parent, inquiring as to whether his or her behavior demonstrates a willful disregard of his or her parental responsibility.[13]

Judge Cutler made specific written findings on Gary's abandonment of Daniel, determining that:

Clearly [Mr. Carson] has abandoned [Daniel]. [Mr. Carson] knew all along that he had a son as a result of a sexual relation with the fourteen-year-old mother. He has never paid support for the child, partly out of convenience to himself and partly because he was never asked for support. He has not ever seen the child. He indicated he took a "back seat" because he thought that action would be best for everyone.

In addition, in her oral findings, Judge Cutler began by stating that

it seems abundantly clear—way beyond clear and convincing—that [Mr. Carson] did, in fact, abandon [Daniel] for the first half of his life.... No question that he knew he had a son born to him and that he just abandoned him, flat out.... [N]o definition of abandonment would not include that kind of conduct, and even if he may have had good personal reasons and it might have even been better for [Daniel] ... to be abandoned by his father, in light of all of the things we have heard about the young life of both [Jana] and [Mr. Carson], but he was clearly abandoned by him.

In response to a question whether she was finding that Gary had *willfully* abandoned Daniel, Judge Cutler responded: "It's my finding, by clear and convincing proof, that for the first many years of [Daniel]'s life that he was willfully abandoned by [Gary]. [Gary] may have had his own reasons." Nonetheless, the court concluded, "it was clearly willful abandonment in my opinion, ... based on the totality of what was presented about the circumstances."

Gary argues that he "did not consciously disregard his parental responsibilities." He maintains that he wanted to act as a father to Daniel, but that he was not provided the opportunity to do so by the mother, who rejected his offers of assistance. He claims that his failure to pursue fatherhood was due to his sensitivity to the wishes of the mother and her family and his fears that "to become more assertive would have cut him and his mother off from any contact or information." According to Gary, his immediate interest in Daniel once Gary learned he was in DFYS custody demonstrates that it was Jana who barred him from being a father, not his own lack of initiative.

Gary's contention that he did not willfully abandon his son or cause the destruction of the child-parent relationship lacks merit. As in *In re H.C.*,[14] in which we found the failure of a father to maintain any contact with his daughter for over one year to demonstrate his willful abandonment,[15] Gary's objective conduct belies his assertions. Daniel and Gary have had no contact during Daniel's ten-year life, and Daniel only found out that Gary was his biological father in 2001. Gary has never actively attempted to provide financial or emotional support to Daniel, has never tried to see him, to gain custody of him, or to develop any type of a relationship with him. Whatever Gary's reasons for not attempting to act as a parent to Daniel for the first ten years of his life, his decision was

---

12. *Id.* (quoting *D.M. v. State*, 515 P.2d 1234, 1237 (Alaska 1973)).

13. *Id. See also Nada A. v. State*, 660 P.2d 436, 439 (Alaska 1983) (indicating that while involuntary incarceration might not suffice to establish abandonment, an eight-month voluntary absence prior to incarceration would) *legislatively overruled on other grounds*, § 1, ch. 99, SLA 1998.

14. 956 P.2d 477 (Alaska 1998).

15. *Id.* at 482. *See also E.J.S.*, 754 P.2d at 751 (affirming finding of abandonment based on father's failure to make reasonable efforts to locate and communicate with his daughter for five years); *In re B.J.*, 530 P.2d 747, 750 (Alaska 1975) (holding that father's failure to acquire suitable home for his children, pay even nominal child support, visit or correspond with his children, or make efforts to secure permanent employment were sufficient to demonstrate conscious disregard of his parental obligations).

conscious and calculated, and he sets forth no basis on which we could determine that the superior court erred in finding that his conduct amounts to willful abandonment.

### B. The Trial Court Did Not Err in Determining that DFYS Had Made Reasonable Efforts To Reunify Gary and Daniel.

■ In a termination proceeding, the superior court must also find "by preponderance of the evidence that the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts."[16] In relevant part, section .086 requires DFYS to make timely, reasonable efforts to provide family support services to the parent and child "that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement."[17] Specifically, the duty to make reasonable efforts requires that DFYS identify family support services to remedy the causes of CINA jurisdiction, "actively offer" these services to the parent, and refer the parent to community-based family support services whenever available and desired by the parent.[18] Additionally, "[i]n making determinations and reasonable efforts under this section, the primary consideration is the child's best interests."[19]

In considering this factor, Judge Cutler found that under the circumstances, the department had made reasonable efforts to provide remedial and rehabilitative services to Gary. While recognizing in her oral findings that DFYS was admittedly "disappointed" upon learning that Gary was the father, and that "[t]hey could have made more efforts if their heart was in it more strongly,"

Judge Cutler found that "clearly they did make an effort here, and I think it was definitely reasonable in the circumstances."

■ We have held that "[a] parent's incarceration significantly affects the scope of the active efforts that the State must make."[20] Especially in situations such as this, where the parent is incarcerated in another state, the trial court may consider factors such as the difficulty of providing services to inmates generally, the specific resources available for the incarcerated parent in question, and the expected length of incarceration.[21] Additionally, where a parent is in prison, "we have held that the Department of Corrections, rather than DFYS, may fulfill this obligation by enrolling the parent in classes and treatment programs."[22]

Gary admits that DFYS was limited in the services it could provide to him due to his incarceration and concedes that efforts of any state agency, including the Department of Corrections (DOC), will suffice to meet DFYS's obligation. Nonetheless, he contends that DFYS's contact with his jail counselor was not sufficient to meet its requirements under the statute. At the very least, Gary maintains, DFYS should have been required to contact Colorado or Mesa County child protection authorities to ascertain what community-based programs they were aware of, something DFYS declined to do until well after the trial had begun. In response, the state explains that Gary was offered all of the classes and treatment available to inmates in Colorado and that therefore, DFYS's efforts were reasonable.

Given the amount of time available[23] and the fact that Gary was incarcerated in another state throughout the period that services

16. AS 47.10.088(a)(2).

17. AS 47.10.086(a).

18. *Id.*

19. AS 47.10.086(f).

20. *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999).

21. *Id.*

22. *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 26 P.3d 1089, 1096 (Alaska 2001).

23. As discussed in Part C of this opinion, Daniel had already been in foster care for a significant period of time and had seen at least one preadoptive placement fall through as a result of these proceedings. Because allowing for additional time for DFYS to provide Gary with reunification services would not have been in Daniel's best interests, DFYS faced a short window during which to provide Gary with such services.

could be offered to him, DFYS was limited in how much it could do for him. DFYS social worker Jean Marie Hakenson testified as to her efforts upon learning that Gary might be the father, explaining that she immediately prepared a case plan, requesting parenting and anger management classes and substance abuse assessment and treatment. She also contacted Cindy Fugate, Gary's case manager at Sterling Correctional Facility, to find out what classes were available to Gary while in prison. Gary had already taken a number of these classes, which were then listed in Ms. Hakenson's permanency report. Furthermore, when Gary informed Ms. Hakenson that he might be moving to a halfway house, she told him to notify her when he was actually there so she could arrange for services for him there. Ms. Hakenson admitted that after speaking with Ms. Fugate at DOC, she did not contact any neighborhood mental health facilities or community-based programs to see if any additional services were available for Gary. However, she testified that it was her belief that when a person is in prison, DFYS is only required to determine what services are available in the prison, and not in the community at large.

The trial court found that DFYS had made reasonable efforts by contacting DOC in Colorado and requesting that any available classes or services be provided to Gary. Given the range of relevant DOC offerings, including substance abuse counseling, anger management, relapse prevention, life skills seminars, and strategies for self-improvement and change, we see no reason why DFYS should have been required to seek out additional community-based services in this situation. As the state points out, given that Gary was in jail, and there was no home to which Daniel could be returned, the department's efforts were clearly reasonable under the circumstances. We find that the evidence supports the court's finding that reasonable efforts were made by DFYS and we therefore affirm Judge Cutler's determination that the requirements of AS 47.10.086 have been met.

24. AS 47.10.088(c).

## C. The Trial Court Did Not Err in Finding that Termination of Gary's Parental Rights Would Be in Daniel's Best Interests.

The final requirement for termination of parental rights is that the court consider the best interests of the child.[24]

In its written findings, the court stated:

Given the age of the child and length of time that he has been in custody (over 4½ years), there is a critical risk of long term harm to the child if there is not immediate permanency. The court finds that the child's counselor, Ms. [Houston], is a disinterested witness in that she has no perceived bias except for a need to look out for the best interests of the child. Her testimony was persuasive in the need for [Daniel] to have a loving, nurturing, and stable environment as soon as possible.

In her testimony, Lori Houston attested to the extreme importance to Daniel of having a stable, permanent home and of not getting his hopes up and then being disappointed again. She also voiced her concerns about the family's history and "about what type of treatment that a family with that level of dysfunction has gone through in order to repair and obtain a level of functioning that is going to be appropriate for [Daniel]."

In addition to this testimony, the trial court considered the statements of Gary himself. Specifically, the trial court expressed difficulty giving much credence to Gary's plans for himself in the future:

I do think, while he states that he expects to be a different person now than he was during the first eight or 10 years of [Daniel's] life, that in some ways I find his statements not as credible as I would those of a person who had been more stable in their life, because it does appear to me that he may—while he can verbalize the idea of who he is and what he thinks his abilities are, that often the idea a person has in their mind of who they are and what their abilities are, the idea is often not the same as their ability to actually be that person or follow through[ ] . . . I'm saying as the judge I don't completely disbelieve

him, but I do have great concern that his own idea of who he is and what his abilities are to be a good parent to [Daniel] and his ability to actually follow through might be separated by a lot of—there might be a lot of differences between what will actually happen and what he hoped would happen.

 Gary maintains that Judge Cutler's decision that it was in Daniel's best interests for Gary's parental rights to be terminated was clearly erroneous, given that under Gary's proposed plan of placing Daniel with his grandmother Faye, permanency could have been achieved immediately. Gary argues, "With this plan, [Daniel] could have reunited with his father when, if ever, the state deemed it safe and appropriate. Also, if the trial court's fears about [Gary's] likelihood to reoffend came true, [Faye] could provide continuity, permanency, and protection of [Daniel] until he was grown." Because Daniel was not in an adoptive placement at the time of trial, Gary argues that the court should have preferred placement with Faye to Daniel's current situation.[25]

Judge Cutler specifically found that while Daniel's best interests would be served by permanency, they would not be met by a placement with his paternal grandmother:

It appears that [Gary] and his mother [Faye], who's the grandmother that Mr. Luffberry argues really would be a perfect adoptive placement, also have a pretty dysfunctional relationship that's codependent in bad ways, and that really [Faye] was not highly successful in raising [Gary] to be a normal, ordinary, functioning adult male, and we should be concerned about [Daniel] following a bad pattern as opposed to a good pattern if he were somehow to get into placement with them.

Considering the length of time Daniel has been in state custody, that he has never met or been given the opportunity to develop a relationship with his father, that his grandmother's home was rejected as a possible placement for him in the ICPC home study,

that Gary's future is uncertain, that Gary has a long history of criminal behavior and sexual misconduct, and that Daniel is currently in a placement which may result in adoption, we do not believe Judge Cutler erred in finding that Daniel's best interests would not be served by placement with Faye and denial of the state's petition to terminate Gary's parental rights. Given the ample support in the record for the court's best interests finding, we therefore affirm the trial court's determination that termination of Gary's parental rights would be in Daniel's best interests.

## V. CONCLUSION

Because none of the factual findings underlying Judge Cutler's decision was clearly erroneous and because these findings provide sufficient support for each of the requirements of AS 47.10.088, we AFFIRM the superior court's decision to terminate Gary's parental rights.

---

**25.** Gary also argues that AS 47.14.100(e) requires placement with Faye because she is a blood relative. However, as Gary concedes, he did not raise this argument at trial, and therefore we deem it to have been waived. *See Brandon v.* *Corrs. Corp. of Am.,* 28 P.3d 269, 280 (Alaska 2001) (repeating well-established rule that this court will not treat issue on appeal that was not raised at trial).