RALPH H., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–13852.

Supreme Court of Alaska.

Feb. 4, 2011.

Caitlin Shortell, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Krista Berghoff, Office of Public Advocacy, Palmer, Guardian Ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

STOWERS, Justice.

## I.  INTRODUCTION

Ralph appeals the superior court's judgment terminating his parental rights to his only son, Rex.[1] The Office of Children's Services (OCS) removed Ralph's and Nell's five children after Ralph physically assaulted

---

1.  We use pseudonyms to protect the family's privacy.

their oldest daughter.[2] OCS put the children in foster care and provided the parents with case plans. The parents moved away from the community where the children were placed, which made visitation with Rex difficult. OCS and the children's guardian ad litem (GAL) petitioned to terminate Ralph's and Nell's parental rights. The superior court terminated Ralph's and Nell's parental rights to Rex after finding that OCS made reasonable efforts at reunification and that termination was in Rex's best interests. Because the superior court's factual findings were not clearly erroneous and its legal conclusions were correct, we affirm the judgment in all respects.

## II. FACTS AND PROCEEDINGS

Ralph and Nell are the parents of Ava, Bella, Daria, Emma, Rex, and Faith. OCS involvement with the family due to chronic neglect and physical abuse began in 1992. In May of 1992 eight-month-old Ava was taken to Seward General Hospital "with serious bruising and abrasions[,] a possible fractured rib, [and] serious physical injuries." OCS assumed emergency custody of Ava.

Over the next eight years, OCS received approximately 23 reports of harm on the family. The reports involved allegations of physical abuse or instances of neglect. Throughout this time, Ralph and Nell neither acknowledged nor addressed their parenting problems through the services that OCS offered. A pattern developed in that OCS would begin to investigate a report of harm or engage the family in services, but the parents would move the family to another community.

From 1997 until 2006 the family had an open file with the Department of Health and Social Services, Division of Public Health (Public Health). Public Health personnel considered the family "high risk." The Public Health file shows chronic neglect because of repeated infestations of head lice, poor parenting, and lack of housing, clean clothing, and food. OCS worked with Public Health to provide services to the family.

In 2001, when the family lived in Homer, OCS social workers attempted to engage the parents but the family moved further and further out of town. The family then moved to Seward, but abandoned their rented home in July 2001, leaving it in a filthy state.

The family next moved into a camper parked illegally near Resurrection Bay. After receiving another report of neglect, an OCS social worker arranged wrap-around services for the family. These services included referrals to or assistance provided by a number of agencies and programs: Public Health, Infant Learning Program, a parent training program, Head Start, the school district, a mental health program, law enforcement, and OCS. Despite this, the family moved to the Mat–Su Valley. The social worker transferred the case file to the OCS office there.

Between 2002 and 2004 multiple reports of harm were filed against the family in the Mat–Su Valley. Social workers arranged food donations, conducted home visits to monitor the status of the home, spoke to Ralph and Nell about getting assistance through Alaska Housing Finance Corporation, offered to pay for repair of the family's heating system, and referred the family to Dual Track.[3] At the end of the program, Dual Track referred the family to the Salvation Army Family Services Program. After receiving reports of neglect based on poor school attendance, a social worker referred the family back to Dual Track, which provided additional services.

The family had moved to Homer by September 2006. OCS received another report alleging that the family was homeless and that the children missed school because of head lice. A social worker and school staff found a cabin for the family and provided mattresses and laundry cards to help the family get rid of the lice. The social worker

---

2. The youngest child, Faith, had not yet been born.

3. Dual Track is a program within the State of Alaska, Department of Health and Social Services, which enables the department to refer low risk reports of harm to a community-based non-

profit social services agency. Dept. of Health & Soc. Servs., Family Preservation Component, *State of Alaska FY2002 Governor's Operating Budget* (Jan. 05, 2001), http://omb. alaska.gov/omb-files/02—budget/Budget/H$S/comp1628.pdf.

also created a case plan in December 2006 that required Ralph and Nell to seek consistent employment, maintain clean and adequate housing, and work with school nurses to get rid of the lice.

On March 30, 2007, OCS received a report alleging that Ralph had "pulled [Ava's] hair and scratched her face." Ava told the social worker that she had argued with her father, and that when she tried to leave the home, Ralph "grabbed her face by reaching over her from behind and his fingernails caused a cut on her nose." Ava said Ralph then "pulled her hair and forced her back into the home." She said that her father had previously slapped her face and back, and that he had kicked her. The social worker testified that Ava had "marks on her head from being hit by her father." Ava's siblings corroborated Ava's allegations and expressed concern about the condition of their home.

Based on the evidence of physical abuse, mental injury, and chronic neglect, OCS assumed custody of all five children and put them in foster care. An OCS social worker created a case plan for the family. OCS referred Ralph for a substance abuse assessment, referred both parents for psychological assessments to determine what other services were necessary, and arranged for supervised visits at the OCS office. The social worker also referred the children to counseling services.

After their removal, the children remained in the Homer area to facilitate visits with their parents. Rex's initial placements included two different Homer foster homes. He participated in a behavioral health assessment which recommended that he receive mental health services. Due to his aggressive behavior and the unavailability of a closer placement, Rex was moved to a foster home in Kasilof where he began individual therapy at Nakenu Family Services. The record does not suggest that Rex has left this foster home.

OCS sought to coordinate regular visits between the parents and the children. Visits with Rex were scheduled twice a month in Kenai. Ralph and Nell were responsible for buying gas for the first monthly trip and OCS paid for gas for the second. In September 2007, shortly after the children were taken into OCS custody, the parents moved away from their children, back to the Mat–Su Valley.

OCS prepared another case plan in September 2007, which required that Ralph complete an Alaska Family Services (AFS) parenting class in Palmer. It also required that he participate in individual therapy, show that he could refrain from aggressive behavior, participate in an intake assessment at AFS's Family Violence Intervention Program, and follow that assessment's treatment recommendations. An OCS social worker wrote a letter to Alaska Housing Finance Corporation to assist Ralph and Nell with housing.

Ralph finished the Family Violence Intervention Program in June 2008. Ralph and Nell participated in psychological evaluations with Michael Rose, Ph.D. Dr. Rose concluded that Ralph met the diagnostic criteria for Child Abuse/Neglect, Partner Relational Problem, and Cannabis Abuse. Dr. Rose also diagnosed Ralph with "personality disorder with antisocial and passive-aggressive features." Dr. Rose recommended that Ralph's visits with his children be supervised until he showed progress in his treatment.

Rex was evaluated by Paul Turner, Ph.D., in January 2008 because of abuse in his home. He told Dr. Turner that his father would "yell, scream, and throw things at people." He also described his father "smacking" a sister, and stated that his father spanked him very hard with a paddle.

During 2008 Ralph attended the Family Violence Intervention Program. However, he was not considered to have completed the program because he failed to pay for the program in full which demonstrated a lack of accountability. At the time of the termination trial Ralph was under a recommendation to redo the program because of his ongoing aggressiveness.

OCS continued to offer the parents visits with the children to promote reunification but the parents' visits with Rex were inconsistent. To help with travel expenses, the social worker gave gas vouchers to Ralph and Nell and arranged for OCS to provide

airfare and mileage reimbursements so they could fly to some visits. Despite this offered assistance, Ralph and Nell failed to visit Rex regularly. Between October 2007 and June 2008, they visited Rex just once, at Christmas 2007.

In April 2009 Nell asked about restarting visits, but visits did not resume because Rex's therapist recommended that in-person visits with Ralph and Nell should not continue. Other reunification efforts continued through 2009 with an OCS social worker again updating the parents' case plans. The social worker conducted home visits and spoke with the parents about services including couples and individual therapy.

OCS initially filed a petition to terminate parental rights of all the children when Rex was eight. After doing so, OCS once again referred Ralph and Nell for psychological evaluations with Dr. Rose. Based on the results of Dr. Rose's evaluations, OCS decided it was in the children's best interests to give the parents further access to reunification services. Ralph and Nell sought a six-month continuance of the termination trial. The children's GAL opposed this request but OCS did not.

The superior court denied the continuance with respect to Rex. Based on this ruling, OCS attempted to withdraw its termination petition as to Rex. The GAL objected and the superior court refused to allow OCS to withdraw its petition. Instead, the court permitted the GAL to prosecute OCS's petition to terminate parental rights to Rex.[4] By the conclusion of the termination trial, Rex had been in foster care for over two years.

The superior court terminated parental rights to Rex. The superior court concluded that Rex was a child in need of aid (CINA) pursuant to Alaska Statute 47.10.011(1) (abandonment), (6) (physical harm), (8) (mental injury), (9) (neglect), and (11) (mental health). The superior court further concluded that the parents failed within a reasonable time to remedy the conduct or conditions that placed Rex at risk of harm, and that OCS made reasonable efforts to reunify the family. It also concluded that it was in Rex's best interests for Ralph's and Nell's parental rights to be terminated.

Ralph appeals that order; Nell does not.

## III. STANDARD OF REVIEW

■ We review a superior court's factual findings regarding termination of parental rights for clear error.[5] A finding is clearly erroneous when a review of the entire record leaves this court with "a definite and firm conviction that the superior court has made a mistake." [6]

■ We review de novo whether the superior court's findings satisfy applicable CINA statutes and rules, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy." [7]

■■ We will reverse factual findings under the clearly erroneous standard only if, after a review of the entire record in the light most favorable to the party prevailing below, we are left with a definite and firm conviction that a mistake has been made.[8] Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh the evidence when the record provides clear support for the superior court's ruling.[9]

---

4. Neither the appellant nor OCS challenged the superior court's denial of OCS's motion to withdraw the petition to terminate parental rights or the court's order that the GAL was authorized to present evidence in support of the petition filed by OCS. We therefore have no occasion to address these issues in this case.

5. Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 77 P.3d 715, 717 (Alaska 2003).

6. Id. (quoting G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 67 P.3d 648, 650–51 (Alaska 2003)).

7. Id. (quoting Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

8. Jon S. v. State, Dep't of Health & Social Servs., Office of Children's Servs., 212 P.3d 756, 761 (Alaska 2009) (internal citations omitted).

9. Maisy W. v. State, Dep't of Health & Social Servs., Office of Children's Servs., 175 P.3d 1263, 1268 (Alaska 2008).

Whether the parent has remedied the conduct or conditions that places the children at substantial risk of physical or mental injury, and whether returning the child to the parent would place the child at substantial risk of physical or mental injury, are factual determinations and will only be reversed for clear error.[10]

## IV. DISCUSSION

The superior court must make four separate findings before terminating parental rights. The court must find by clear and convincing evidence that: (1) the child is a child in need of aid, as defined in AS 47.10.011;[11] (2) the parent has not remedied the conduct or conditions that placed the child at substantial risk of harm;[12] and (3) OCS has made reasonable efforts, as defined in AS 47.10.086, to reunify the child with the parent.[13] The court must find by a preponderance of the evidence that (4) termination of parental rights is in the best interests of the child.[14]

Ralph does not contest that termination of his parental rights was in Rex's best interests.

### A. The Superior Court Did Not Err By Finding That Rex Was A Child In Need Of Aid Under AS 47.10.011(1), (6), (8), (9), and (11).

In order to terminate a parent's rights and responsibilities, a superior court must find by clear and convincing evidence that the child has been subjected to conditions or conduct that would render the child to be a child in need of aid pursuant to AS 47.10.011.[15] The superior court found Rex was a child in need of aid under AS 47.10.011(1), (6), (8), (9), and (11).

### 1. AS 47.10.011(1): Abandonment

Under AS 47.10.011(1), a child may be in need of aid if "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be in need of aid under this chapter."

Alaska Statute 47.10.013 provides:

> For purposes of this chapter, the court may find abandonment of a child if a parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult. Abandonment of a child also includes instances when the parent or guardian, without justifiable cause
>
> . . .
>
> (2) has made only minimal efforts to support and communicate with the child;
>
> (3) failed for a period of at least six months to maintain regular visitation with the child[.]

In addition to conscious or "willful" disregard, there also must be evidence that the parental conduct resulted in the destruction of the parent-child relationship.[16]

The superior court found beyond a reasonable doubt[17] that Rex was a child in need of

---

10. *Barbara P. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 234 P.3d 1245, 1250 (Alaska 2010).

11. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

12. AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(I)-(ii).

13. AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

14. CINA Rule 18(c)(3).

15. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

16. *Rick P. v. State, OCS*, 109 P.3d 950, 957 (Alaska 2005) (citing *G.C. v. State, Dep't of Health &*

*Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 651–52 (Alaska 2003)).

17. Ralph states in his brief that "[a]ppellant's brief will also explore how the court's order applied the incorrect standard by stating that this finding had been proven beyond a reasonable doubt when the applicable standard of proof is by clear and convincing evidence." Ralph failed to meaningfully develop this argument, and his claim is waived. We note, however, that even though AS 47.10.088(a)(1) and CINA Rule 18(c)(1)(A) require the court to make a child in need of aid finding by clear and convincing evidence, it is not error for a court to make such a finding by a *higher* standard of proof, which is what the court did in this case.

aid pursuant to AS 47.10.011(1) based on Ralph's and Nell's failure to visit Rex for a seven-month period in 2008, their failure to make regular visits between December 2008 and September 2009, and their failure to send any correspondence or pictures to Rex. Ralph does not dispute these findings.

The superior court found that this lack of visitation was not excused by the distance separating Ralph's and Nell's home from Rex's placement because the parents had "placed themselves in the position of being so far away from Rex and the department did make reasonable efforts in helping to provide them with gas money and opportunity for visits."

There is substantial evidence that Ralph failed to maintain regular contact with Rex. In September 2007 Ralph and Nell moved from Homer to the Mat–Su Valley when Rex was placed in a foster home on the Kenai Peninsula. The superior court found that Ralph and Nell moved to the Mat–Su Valley with "no clear benefit to the children or parents." As previously mentioned, none of the children's placements were in the Mat–Su Valley. For therapeutic reasons, it was decided that Rex needed to remain on the Kenai Peninsula and that visits should occur there. Ralph's and Nell's visits became infrequent and irregular despite OCS's offers of gas vouchers, airfare, and mileage to defray the cost.

There is also evidence that the lack of consistent contact led to the destruction of the parent-child relationship. Dr. Turner testified that if Rex had not seen Ralph and Nell in the previous eight months, there could be substantial risks in restarting visits, including exacerbating Rex's Reactive Attachment Disorder, his Oppositional Defiant Disorder, and an increased risk of serious psychopathology later in life. Social worker Katheryne Calloway testified that due to the long time since Rex's last visit with his parents, she would be concerned about renewing

contact, particularly because Rex "talked about it being difficult for him to not know what's happening, for his parents to come to visits and his parents to stop coming to visits."

Ralph argues that he consistently visited Rex and relies on statements in the GAL's pre-disposition report from August 2007. However, the superior court relied on the lack of visitation for seven months in 2008 and between December 2008 and September 2009, not conduct prior to August 2007.

Ralph also argues that his lack of visitation should have been excused because he was too poor to visit more often. This argument is unconvincing in light of the fact that Ralph and Nell moved away from Rex to the Mat–Su Valley, and that OCS offered to assist the parents with gas vouchers, airfare, and mileage. The superior court addressed this argument and found that the parents "placed themselves in the position of being so far away from Rex and the department did make reasonable efforts in helping to provide them with gas money and opportunity for visits."

Ralph also argues that the superior court erred because he was a better parent than the father in *Jeff A.C., Jr. v. State.*[18] As OCS noted in its brief, the facts discussed in *Jeff A.C., Jr.* do not set the minimum standard that must be reached to show abandonment.

Given this record the superior court's finding that Rex was a child in need of aid pursuant to AS 47.10.011(1) was not clearly erroneous.[19]

### 2. AS 47.10.011(6): Physical Harm

Under AS 47.10.011(6), a child may be in need of aid if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent." The superior court found that Rex was

---

18. 117 P.3d 697 (Alaska 2005) (finding that father had abandoned his child when he made no effort to determine whether he had fathered the child, and once informed that he was the parent, expressed no desire to assume parental responsibility for one year thereafter).

19. OCS correctly argues that because the superior court also found that Nell caused Rex to be a child in need of aid and Ralph has not challenged this finding on appeal, AS 47.10.011(1)'s "other parent" requirement was met.

at substantial risk of physical harm based on domestic violence in the family's home.

OCS argues that because the statutory provision looks to the risk of physical harm, OCS need not wait until a child has suffered actual harm before intervening.[20] In considering whether such risk exists, the trial court may look to "the totality of the State's evidence."[21] OCS argues that there was sufficient evidence to support the finding of substantial risk of harm to Rex.

Ralph himself acknowledged his physically abusive behavior. At the termination trial, Ralph testified about his own father abusing him and stated "I tried other things with my children and they didn't work, [so] I resorted to whippings and spankings." He acknowledged that his assault on Ava, which led to OCS assuming custody of his children, was an act of violence. He also testified that if OCS had not removed Rex, his relationship with Rex would have been similar to Ralph's relationship with his own father.

Ralph argues that there is no admissible evidence to support the finding that Rex was a victim of physical abuse. However, evidence about physical abuse of Rex was presented by Dr. Turner. Ralph challenges the admission of social worker Katheryne Calloway's testimony about Rex's statements of physical abuse as inadmissible hearsay. Even if that testimony is excluded as hearsay there is still sufficient evidence to support the superior court's finding that Rex is a child in need of aid pursuant to AS 47.10.011(6).

Given this record, the superior court's finding that Rex was a child in need of aid pursuant to AS 47.10.011(6) was not clearly erroneous.

### 3. AS 47.10.011(8): Mental Injury

■ The superior court found that Rex was a child in need of aid under AS 47.10.011(8). The superior court did not specify which subsection of (8) it relied upon.

Alaska Statute 47.10.011 provides:

[T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:

. . .

(8) conduct by or conditions created by the parent, guardian, or custodian have

(A) resulted in mental injury to the child; or

(B) placed the child at substantial risk of mental injury as a result of

(i) a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury; or

(ii) exposure to conduct by a household member, as defined in AS 18.66.990, against another household member that is a crime . . .; or

(iii) repeated exposure to conduct by a household member, as defined in AS 18.66.990, against another household member that is a crime. . . .

The superior court found that Rex suffered from "cognitive delays, limited self-esteem, attachment disruptions, anger and aggressive outbursts." It also found that Rex was diagnosed with Reactive Attachment Disorder and severe Oppositional Defiant Disorder likely because of pathogenic parental care. The superior court found that Rex had memories of physical abuse of himself and his siblings by his parents, and made findings about Ralph's pattern of abusive, aggressive, and threatening conduct.

Under AS 47.10.011(8)(A), a court may determine a child is a child in need of aid if conduct or conditions created by the parent have resulted in mental injury to the child. "Mental injury" is defined as "a serious injury to the child as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner"; "the existence of that impairment is supported by the opinion of a qualified expert witness."[22]

---

20. OCS cites *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 54 (Alaska 2003).

21. *Id.*

22. AS 47.10.990(21) incorporating the definition found in AS 47.17.290(9).

Dr. Turner and licensed clinical social worker Pat Truesdell, Rex's therapist of two years, testified about Rex's inability to function in a developmentally appropriate manner. Dr. Turner diagnosed Rex with Reactive Attachment Disorder, a history of severe neglect, and severe Oppositional Defiant Disorder. Dr. Turner was of the opinion that Rex's problems were related to neglect, exposure to domestic violence, and pathogenic parenting. Truesdell also diagnosed Rex with Reactive Attachment Disorder. Truesdell further noted that Reactive Attachment Disorder usually begins with pathogenic parenting.

There is sufficient evidence in the record to support a finding by the superior court that Rex was exposed to domestic violence and that he was a child in need of aid under AS 47.10.011(8)(A). The superior court's findings were not clearly erroneous.

### 4. AS 47.10.011(9): Neglect

■ The court may find a child to be in need of aid if "conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect." [23] Neglect is further defined in AS 47.10.014:

> For purposes of this chapter, the court may find neglect of a child if the parent, guardian, or custodian fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial or other reasonable means to do so.

The superior court found that Rex was a child in need of aid based on neglect under AS 47.10.011(9).

Ralph had stipulated to adjudication that his children had been neglected. On appeal, his argument is: "Although much was made of a long history of neglect in this case (OCS

neglected to assume custody based on reports of harm from 1992 until 2007), there was inadequate support for a finding of neglect at the time of the termination trial." Ralph did not adequately brief his argument challenging the court's finding of neglect,[24] and regardless, the record provides ample evidentiary support for the superior court's finding of neglect.

### 5. AS 47.10.011(11): Mental Illness

■ AS 47.10.011(11) provides that a court may find a child to be in need of aid if "the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury." The superior court found Rex was a child in need of aid under this subsection.

Ralph admits that he has a mental illness but argues that there was not sufficient evidence that his mental illness placed Rex at substantial risk of physical harm or mental injury to support the superior court's finding.

Dr. Rose was of the opinion that Ralph's personality disorder would give Ralph a "tendency not to consider the children's needs before his own needs, and to also behave in a somewhat over[-]controlling or arrogant fashion. Parents with antisocial features usually are somewhat authoritarian and aggressive in their parenting style." Dr. Rose opined that Ralph's personality disorder combined with Rex's Oppositional Defiant Disorder would be a "bad combination, because it usually leads to some explosive confrontations."

Ralph's mental illness combined with the mental injury suffered by Rex, namely his Reactive Attachment Disorder and Oppositional Defiant Disorder diagnosis likely caused by Ralph's pathogenic parenting, supports a conclusion that Rex is a child in need of aid under AS 47.10.011(11).

---

**23.** AS 47.10.011(9).

**24.** Due to inadequate briefing this claim has no merit. *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 719 n. 14 (Alaska 2003) (quoting *Martinson v. Arco Alaska, Inc.*, 989 P.2d 733, 737 (Alaska

1999)) (concluding that a party waives appellate consideration of an issue if it is inadequately briefed); *City of Fairbanks v. Rice*, 20 P.3d 1097, 1106 (Alaska 2000) (holding that issue was so "sparely briefed" as to be waived).

The superior court's finding that Rex was a child in need of aid pursuant to AS 47.10.011(11) was not clearly erroneous.

### B. The Superior Court Did Not Err By Finding That The Parents Had Not Remedied The Conduct Or Conditions That Made Rex A Child In Need Of Aid.

■ Before a court may terminate parental rights, it must find by clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[25] In making this determination, "the court may consider any fact relating to the best interest of the child."[26] Factors include, but are not limited to: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harm will continue; and (5) the history of conduct or conditions created by the parent.[27]

We recently clarified the standard of review for this "remedying the harmful conduct" determination in *Barbara P. v. State, Department of Health & Social Services, Office of Children's Services.*[28] We held that "whether the parent has remedied the conduct or conditions ... that place the child at substantial risk ... [is a] factual determination best made by a trial court after hearing witnesses and reviewing evidence, not [a] legal determination[ ] to which an appellate court should apply its independent judgment."[29] We thus review the superior court's "remedying the harmful conduct" determination for clear error.[30]

The record contains sufficient evidence to support the superior court's finding that Ralph had not remedied the conduct and conditions that placed Rex at substantial risk of harm, as well as the finding that Ralph failed to remedy within a reasonable time.

Even though Ralph attended AFS's Family Violence Intervention Program, he was not in compliance because he failed to pay the program fees in full, and payment of such fees is considered necessary to demonstrate that a parent has accepted accountability for his behavior. Of greater significance, even after attending the program, Ralph threatened to kill a social worker if his son was not returned to him. This fact is clear evidence that Ralph had not remedied his violent conduct.

Dr. Rose, who reevaluated Ralph just before the termination trial, testified that Ralph continued to be self-absorbed, which limited his ability to be empathetic to Rex's needs. Dr. Rose testified that Ralph still saw little need for his behavior to change. Cathy Okeson, Ralph's mental health therapist, testified that Ralph did not yet accept responsibility for his own behavior.

Ralph's own testimony at the termination trial supported a finding that he had failed to remedy his conduct—Ralph admitted that he moved to the Mat–Su Valley to meet his own needs. Ralph also blamed his continued marijuana use on others when he testified: "I've been waiting for someone to tell me, you got to quit."

Ralph argues that he has substantially complied with his treatment plan. However, we have noted that "[c]ompliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen."[31] Based on the testimony discussed above there was sufficient evidence to find that Ralph did not benefit from treatment to

**25.** AS 47.10.088(a)(2)(B).

**26.** AS 47.10.088(b).

**27.** AS 47.10.088(b)(1)-(5).

**28.** 234 P.3d 1245, 1253 (Alaska 2010).

**29.** *Id.*

**30.** *Id.*

**31.** *V.S.B. v. State, Dept. of Health & Social Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002).

such an extent that he had remedied the conduct and conditions that placed Rex at substantial risk of harm.

The superior court did not err in finding that Ralph had not remedied the conduct or conditions that made Rex a child in need of aid.

### C. The Superior Court Did Not Err By Finding That OCS Made Reasonable Efforts.

■ Alaska Statute 47.10.086 provides:

[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid; [and]

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection. . . .

In making determinations under AS 47.10.086, the superior court's primary consideration is the child's best interests.[32]

The superior court concluded that OCS made reasonable efforts to prevent the children's removal and, after OCS assumed custody of the children, to reunify the family.

OCS argues that it had provided referrals for Ralph to Public Health, parenting classes, the Infant Learning Program, Head Start, mental health services, Alaska Housing Finance Corporation, and wrap-around services through the Dual Track program. OCS also points out that it arranged for food donations and laundry cards, conducted home visits, offered to pay for repair of the family's heat-ing system, found a cabin and mattresses for the family, and tried to help Ralph get a job.

OCS also argues that it worked with the family after assuming custody of the children by developing case plans that detailed child-protection issues and services to remedy these issues. OCS made many referrals to help with reunification; referrals were made for multiple psychological assessments with Dr. Rose, to parenting classes, to anger management and domestic violence programs, to both individual and couples therapy, and to Alaska Housing Finance Corporation for assistance with housing. Ralph was also referred for a drug and alcohol assessment. OCS offered the parents assistance with rent.

OCS further argues that it tried to help with the cost of visiting the children by providing gas vouchers and plane tickets or offering mileage reimbursements. OCS referred the children to a variety of mental health services and educational services.

Ralph argues that "efforts made by state agencies prior to OCS custody cannot support a finding of reasonable efforts for a case that began in 2007." However, in assessing whether reasonable efforts were made, the court considers all of OCS's efforts, not just those within a specific time period.[33]

Ralph also argues that the superior court erred because an OCS social worker did not refer him to services to teach him how to parent Rex with his Reactive Attachment Disorder and Oppositional Defiant Disorder diagnoses. OCS argues that this would have occurred in family therapy, in which Truesdell could teach Ralph how to address Rex's Reactive Attachment Disorder and Oppositional Defiant Disorder. The recommendation for family therapy would have needed to come from Truesdell, who could evaluate its appropriateness for Rex. However, Truesdell recommended that Rex not have in-person contact with his parents, which precluded family therapy after that. OCS social worker Katheryne Calloway testified that since Rex was not at a point where family therapy with Ralph and Nell was appropriate, OCS's

---

**32.** AS 47.10.086(f).

**33.** *See Erica A. v. State, Dept. of Health & Social Servs., Div. of Family & Youth Servs.,* 66 P.3d 1, 7 (Alaska 2003).

decision not to offer this service was appropriate.

In light of this record, the superior court's finding that OCS had made reasonable efforts to provide family support services to Ralph is not clearly erroneous.

### D. Termination Of Ralph's Parental Rights Did Not Violate His Due Process Rights Under The Alaska And United States Constitutions.

Ralph argues that termination of his parental rights to Rex violated Ralph's due process rights under the Alaska and United States Constitutions. Ralph's argument is conclusory, and he cites to no authority demonstrating that any of OCS's actions constituted a violation of substantive due process. While we consider this claim waived for inadequate briefing, we note that in *Matter of T.W.R.*[34] we stated:

> [T]he private interest of a parent whose parental rights may be terminated is of the highest order. However, parental rights may be terminated where such steps are necessary to protect the welfare, health and even lives of the children. This is a situation where the State's interest in the welfare of the children involved, outweighs the interest of the parents. The superior court found by clear and convincing evidence that despite her progress, [plaintiff] had demonstrated an inability to care for her children which could not be cured in the foreseeable future or soon enough to allow her to care for her children without exposing them to a risk of abuse and neglect. In such a situation it is not arbitrary to terminate parental rights.[35]

Accordingly, termination of parental rights does not violate due process provided, as in this case, that appropriate findings have been made by the superior court to support terminating the parent's parental rights.

## V. CONCLUSION

We AFFIRM the superior court's findings that Rex is a child in need of aid pursuant to

AS 47.10.011(1), (6), (8), (9), and (11); that Ralph did not remedy the conduct or conditions that made Rex a child in need of aid; that OCS made reasonable efforts; and the order terminating Ralph's parental rights to Rex.

CHRISTEN, Justice, not participating.

---

**34.** 887 P.2d 941 (Alaska 1994) (internal citations and quotations omitted), *overruled on other grounds by Matter of S.A.,* 912 P.2d 1235, 1237 (Alaska 1996).

**35.** *Id.* at 947.